**In re Kent Edwin FICKEN and Roberta Pauline Ficken, Debtors.**

**Kent Edwin Ficken and Roberta Pauline Ficken, Plaintiffs,**

v.

**Internal Revenue Service, Defendant.**

**Bankruptcy No. 05–52940–HRT.**
**Adversary No. 08–01687–HRT.**

United States Bankruptcy Court, D. Colorado.

July 30, 2009.

650

Judith A. Shively, Erie, CO, for Plaintiffs.

Richard A. Schwartz, U.S. Dept. of Justice, Karen L. Pound, Washington, DC, Tamara Kotzker, Denver, CO, for Defendant.

### ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HOWARD R. TALLMAN, Chief Judge.

This case comes before the Court on *Plaintiffs' Motion for Summary Judgment* (Docket # 20) filed on May 1, 2009; Defendant's *Motion for Summary Judgment* filed May 1, 2009 (Docket # 22); the Defendant's response filed May 18, 2009 (Docket # 24); and the Plaintiff's response filed June 8, 2009 (Docket # 25). The Court is prepared to rule and hereby rules as follows.

### Background

The parties have stipulated to the applicable facts. The Debtors/Plaintiffs, Kent and Roberta Ficken ("Fickens"), own a cattle farm in Eastern Colorado. Fickens filed a petition on December 2, 2005, for relief under Chapter 12, an Amended Plan was filed on January 18, 2006, and the plan was confirmed on February 13, 2006. Section 4.2.7 of the Amended Plan states, inter alia, that "[Fickens] will sell all of the cattle owned by [Fickens] no later than December 31, 2005 and pay the net proceeds to Vectra Bank...." [1]

In 2006, Fickens sold their entire herd of cattle for $139,522, comprised of $62,429 from the sale of 88 calves ("calves" or "calf inventory") and $77,093 from the sale of 73 cows and 2 bulls ("breeding livestock"). The parties agree that the breeding livestock were "used in the debtor's farming operation" as stated in 11 U.S.C. § 1222(a)(2)(A) and were also "property used in the trade or business" under I.R.C. § 1231(b)(3).

---

1. There appears to be a typographical error in the plan that neither party raised in their pleadings, motions for summary judgment or accompanying briefs. The plan was filed on January 18, 2006, and confirmed on February 13, 2006. Accordingly, this Court will treat Section 4.2.7 to read, *inter alia*, that "[Fickens] will sell all of the cattle owned by [Fickens] no later than December 31, 2006...."

After the sale was completed, Fickens treated the post-petition tax as a beneficial (unsecured) debt pursuant to 11 U.S.C. § 1222(a)(2)(A) for the sale of both the breeding livestock and the calf inventory. Fickens used the marginal tax allocation method described in *In re Knudsen*, 389 B.R. 643, 665 (N.D.Iowa 2008), when they determined their tax liability. On October 1, 2008, the Fickens brought this adversary action against the Internal Revenue Service ("IRS") after IRS indicated that § 1222(a)(2)(A) did not apply and that Fickens owed additional tax.

**Cross–Motions for Summary Judgment**

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), incorporated herein by Fed. R. Bankr.P. 7056. A genuine issue of material fact exists when a non-movant presents facts upon which a reasonable jury could find in his or her favor. *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997). Summary judgment is appropriate in this case as there are no disputed issues of material fact.

**Discussion**

The parties' motions require the Court to interpret 11 U.S.C. § 1222(a)(2)(A). Section 1222(a) provides in relevant part:

The plan shall—

. . .

(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—

(A) the claim is a claim owed to a government unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such a manner only if the debtor receives a discharge;

. . .

11 U.S.C. § 1222(a). The parties dispute whether § 1222(a)(2)(A) applies to the Fickens' post-petition tax liability. Their arguments are discussed below.

*I. 11 U.S.C. § 1222(a)(2)(A) applies to post-petition asset sales*

Fickens first allege that 11 U.S.C. § 1222(a)(2)(A) applies to post-petition asset sales, relying primarily on *In re Hall*, 393 B.R. 857 (D.Ariz.2008); *In re Knudsen*, 389 B.R. 643 (N.D.Iowa 2008); *In re Dawes*, 382 B.R. 509 (Bankr.D.Kan.2008); and *In re Schilke*, 379 B.R. 899 (Bankr. D.Neb.2007). Fickens claim these cases find that Chapter 12 debtors may treat a post-petition tax liability as an administrative expense and the resultant taxes as an unsecured claim not entitled to priority pursuant to § 1222(a)(2)(A). Fickens further assert that § 507(a)(2) provides for priority status for administrative expenses, and that § 1222(a)(2)(A) strips that priority.

IRS relies primarily on the statutory construction and use of "claim" in § 1222(a)(2)(A) that shows Congress' intent to exclude § 507(a) "expenses." IRS also claims that post-petition taxes are not administrative expenses under § 503(b)(1)(B)(i) because they are not "incurred by the estate" for the tax at issue, and therefore not entitled to relief under § 1222(a)(2)(A).

Three district courts on appeal have either affirmed or reversed the bankruptcy court to hold that tax claims from post-petition asset sales are subject to

§ 1222(a)(2)(A). *In re Hall,* 393 B.R. 857, 863–64 (D.Ariz.2008) (reversing bankruptcy court); *In re Knudsen,* 389 B.R. 643, 677 (N.D.Iowa 2008) (affirming bankruptcy court); *In re Dawes,* 415 B.R. 815, 823–24 (Unpublished Memorandum and Order) (D.Kan.2009) (affirming bankruptcy court). Two Nebraska bankruptcy courts also ruled that post-petition tax claims are subject to § 1222(a)(2)(A). *In re Gartner,* 2008 WL 5401665, at *1, 2008 Bankr.LEXIS 3525, at *4 (Unpublished Memorandum and Order) (Bankr.D.Neb. Dec. 29, 2008) (following *In re Schilke,* 379 B.R. 899 (Bankr.D.Neb.2007)); *In re Schilke,* 379 B.R. 899, 903 (Bankr.D.Neb.2007). There is currently no surviving contrary holding.

### A. The "farming operation" is the farming operation under the confirmed plan

▮ The "farming operation" raised in § 1222(a)(2)(A) may be broad enough to accept a reading of either the pre-petition farming operation, or the post-petition farming operation. But the "farming operation" is specifically raised under the requirements of "[t]he plan" of § 1222(a). The context of "the debtor's farming operation" is more specific than the pre-filing farming operation since it is specifically raised in the context of a debtor's Chapter 12 plan. *In re Knudsen,* 389 B.R. at 659.

Since the "farming operation" is raised with respect to the plan, it necessary implies that a bankruptcy petition has been filed and so § 1222(a)(2)(A) applies to post-petition asset sales. Therefore, in order for the transaction to qualify under § 1222(a)(2)(A), the transaction must be for some purpose of the plan.

The determination that the "farming operation" under § 1222(a)(2)(A) is the "farming operation" under the plan is not only consistent with the structure of the statute, but also is consistent with the legislative history. *In re Schilke,* 379 B.R. at 902, is particularly relevant:

> The Knudsen court also relied on legislative history with respect to a bill that preceded the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") which contained a proposed amendment to § 1222(a)(2) identical to the change that was ultimately made in BAPCPA. Senator Grassley, who introduced that bill, made the following comments:
>
> "Safety 2000" [the predecessor bill] also helps farms to reorganize by keeping the tax collectors at bay. Under current law, farmers often face a crushing tax liability if they need to sell livestock or land in order to reorganize their business affairs ... Under the bankruptcy code, the I.R.S. must be paid in full for any tax liabilities generated during a bankruptcy reorganization. If the farmer can't pay the I.R.S. in full, then he can't keep his farm. That isn't sound policy. Why should the I.R. S. be allowed to veto a farmer's reorganization plan? *"Safety 2000" takes this power away from the I.R.S. by reducing the priority of taxes during proceedings.* This will free up capital for investment in the farm, and help farmers stay in the business of farming.

145 Cong. Rec. S750–02, 1999 WL 20426 (Jan. 20, 1999) (statement by Sen. Grassley on S.260); *In re Hall,* 393 B.R. at 863 (quoting *In re Schilke,* 379 B.R. at 902) (emphasis added). The *Hall* court found that the "legislative history ... clearly shows that the language used was intended to allow a debtor to use the amendments to § 1222(a)(2)(A) for taxes generated during the bankruptcy reorganization from the sale of assets used in a farming operation." *In re Hall,* 393 B.R. at 863. Furthermore, the *Knudsen* court noted "that Congress intended to help farmers

reorganize and stay in business by lessening the burden of prepetition and postpetition taxes arising from the sale of assets used in the farmer's farming operation, assets such as equipment and land," and also noting that "Congress placed the entire burden for such intention on § 1222(a)(2)(A)." *In re Knudsen*, 389 B.R. at 671 (N.D.Iowa 2008) (quoting *In re Knudsen*, 356 B.R. at 490–91 (Bankr. N.D.Iowa 2006)).

More broadly, reorganization occurs both before and after the date of filing the bankruptcy petition, which strongly suggests that § 1222(a)(2)(A) applies to both pre-petition and post-petition transactions. *In re Knudsen*, 389 B.R. at 675. There is no language that restricts its applicability to only pre-petition sales. *Id.* To interpret § 1222(a)(2)(A) as applying to only pre-petition transactions is effectively adding language to the statute that is simply not there. *In re Schilke*, 379 B.R. at 902–03. If the statute is construed as the IRS desires, § 1222(a)(2)(A) would apply only to farmers that had the foresight to liquidate assets before filing, and the farmer could choose to make optimal tax decisions instead of optimal business decisions. *In re Knudsen*, 389 B.R. at 677; *In re Dawes*, 382 B.R. at 519. The Court concludes that the statute should not be so limited.

Bankruptcy policy also supports the conclusion that the "farming operation" under § 1222(a)(2)(A) is the farming operation pursuant to the confirmed plan. Based on the legislative history, the intent of the statute is to help farmers reorganize. Fickens also urge this Court to see that the statute would have very little impact if § 1222(a)(2)(A) was inapplicable to post-petition transactions. This Court agrees:

> In fact, if [§ 1222(a)(2)(A) ] is inapplicable to post-petition taxes as the IRS suggests, the statute becomes meaningless for most debtors as it provides no benefit in a reorganization involving the sale of assets used in a farming operation. Chapter 12 expressly contemplates that a plan may provide for the sale of the property of the estate.

*In re Schilke*, 379 B.R. at 903 (citations omitted). Pre-petition taxes are excluded by § 507(a)(8) and would not qualify for treatment under § 1222(a)(2)(A). Section 1222(a)(2)(A) must apply to post-petition asset sales since the statute would have little significance if it was only applicable to pre-petition asset sales.

 Finally, "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act." *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 279, 61 S.Ct. 196, 85 L.Ed. 184 (1940). Furthermore, "ambiguities in the Code are generally resolved in favor of the debtor." *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir. 1989). Since the ambiguities in the Code, and so ambiguities in § 1222(a)(2)(A), if any, should be interpreted in favor of the debtor, the statute should apply to post-petition transactions so as to give the farmer the best opportunity to successfully reorganize. Therefore, the Court concludes that § 1222(a)(2)(A) must be interpreted to include post-petition transactions and the tax be treated as non-priority claims.

*B. IRS' arguments are not persuasive*

 IRS first argues that the intentional use of "claim" in § 1222(a)(2)(A) precludes administrative "expenses" under § 507(a). IRS asserts that § 507(a) deals with "expenses and claims," but that § 1222(a)(2)(A) refers only to "claims" entitled to priority under Section 507. IRS

further asserts that the language of § 1222(a)(2)(A) does not apply to "expenses" entitled to priority under § 507(a)(2). IRS concludes that it was Congress' intent to exclude administrative "expenses" because Congress chose the word "claim" instead of "expenses and claims" when enacting § 1222(a)(2)(A), and this Court should give meaning to words used, or not used, by Congress.

This Court disagrees. The term "claim" is broadly defined under § 101(5) to include "right to payment ..." and "right to equitable remedy...." 11 U.S.C. § 101(5). IRS is asserting its "right to payment" of the taxes generated from the asset sales under the confirmed plan. The broad scope of the term "claim" leads this Court to determine, consistent with the legislative history, that for purposes of § 1222(a)(2)(A), the administrative tax obligations incurred here fall under the Code's expansive definition of "claim." As discussed *supra* in Part I.A, the legislative history shows that the language used was intended to allow a debtor-farmer to use § 1222(a)(2)(A) for taxes generated as a result of the consummation of the Chapter 12 plan. *See In re Hall,* 393 B.R. at 863.

■ IRS next argues that the post-petition taxes do not qualify as administrative expenses under § 503(b)(1)(B)(i) because they were not "incurred by the estate." IRS asserts that no separate taxable entity exists for an individual Chapter 12 debtor and so taxes arising out of the debtors' sale of assets would not be "incurred by the estate." IRS concludes that since the post-petition taxes are not a tax "incurred by the estate" under § 503(b)(1)(B)(i), the taxes arising from the sale of the livestock cannot be a priority claim under § 507(a)(2) and are not entitled to beneficial (unsecured) treatment under § 1222(a)(2)(A).

Section 507(a) provides the priority ordering, and provides in relevant part: "(2) Second, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under Chapter 123 of title 28...." 11 U.S.C. § 507(a).

Accordingly, Section § 503(b) provides in relevant part that

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—... (B) any tax—(i) *incurred by the estate,* whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax specified in section 507(a)(8) of this title;

11 U.S.C. § 503(b) (emphasis added).

■ The Court agrees with IRS that no new taxable entity exists since the Chapter 12 filing does not create a separate taxable entity. However, even though a separate taxable entity was not established, this does not necessarily prelude the tax "expense" from falling under § 503(b)(1)(B)(i). The first step to statutory interpretation is to look at the "plain language" of the statute in question. *See B & D Land & Livestock Co.,* 332 F.Supp.2d at 1210.

■ In this case, there is a legitimate question to the meaning of "incurred by the estate." The statute may reasonably be read to apply to the time the tax liability accrued, or the entity liable for the tax. The statute has two reasonable readings and is, thus, ambiguous. If the text is ambiguous, then the court may look to the legislative history to determine meaning. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 737, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

The *Dawes* court provides an extensive analysis of the legislative history regarding § 503(b)(1)(B)(i). *In re Dawes,* 382 B.R.

at 515–17. The *Dawes* court eventually concludes after reviewing the statute's history that " 'incurred by the estate' in the definition of administrative expenses in § 503(b)(1)(B)(i) has reference to the time when tax liability is incurred and not to whether the estate is a separate taxable entity." *Id.* at 516–17. This Court agrees.

Section 503(b)(1)(B)(i) was enacted as part of the 1978 Bankruptcy Code. The legislative history states:

> In general, administrative expenses include taxes which the trustee *incurs in administering the debtor's estate*, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate during the case. Interest on tax liabilities and certain tax liabilities and certain tax penalties incurred by the trustee are also included in this first priority.

*In re Dawes*, 382 B.R. at 516; S.Rep. No. 95–989, 95th Cong., 2d Sess. 66 (1978), reprinted in *Collier on Bankruptcy* App. Pt. 4–2008. Furthermore, " 'incurred by the estate' was [not] intended to apply only to those situations where the estate itself is a separate taxable entity. In fact, 'incurred by the estate' has been interpreted to simply mean incurred post-petition." *In re Schilke*, 379 B.R. at 902 (citing *L.J. O'Neill Shoe Co.*, 64 F.3d at 1149).

IRS counters the holding that "incurred by the estate" references the time the tax was incurred with separate legislative history. IRS claims that the other legislative history demonstrates that Congress considered which entity incurred the tax at the time of the 1978 Act and that § 346 contemplates some of the separate taxable entity rules for state and local taxes. IRS notes that in the case of a Chapter 13 debtor, § 346(b) requires that any income of the estate or debtor is to be taxed only to the debtor and not to the estate. IRS provides the following legislative history:

> As a practical matter, the function of chapter 13 of title 11 is to give the debtor a breathing spell in which to reach an arrangement with creditors. The plan is filed very rapidly. Although a trustee serves in the case, section 1303 of title 11 gives the debtor exclusive rights to use collateral and section 1306(b) of title 11 mandates the debtor to remain in possession of all property of the estate before confirming of a plan. . . . Therefore, because the debtor does not get an immediate fresh start and because the debtor remains in possession and control of his property, the estate is not made a separate taxable entity. This is bolstered by the administrative reality that most Chapter 13 estates will only remain open for 1 or 2 months until confirmation of the plan at which time section 1327(b) of title 11 will almost always revest title to property of the estate in the debtor.
>
> With respect to a corporate debtor, section 346(c)(1) of the proposed title 11 follows current law. The estate is not a separate taxable entity, and the corporation remains taxable as if the case had not been commenced.

Pub.L. No. 95–598, H.R.Rep. No. 95–595, at 276–77 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963.

The legislative history provided by the IRS appears to illustrate the reasons that a new taxable entity is not created, and that Congress contemplated the difference between the debtor and the taxable entity. This Court agrees that Congress contemplated the reasons for not creating a separate taxable entity. That is not in dispute. The dispute is whether the creation of a separate taxable estate is necessary for the tax to have been "incurred by the estate."

The legislative history discussed in *Dawes* is more direct and unambiguous

than the IRS-supplied legislative history. *In re Dawes*, 382 B.R. at 516. In general, "administrative expenses include taxes which the trustee incurs in administering the debtor's estate." *Id.*; S.Rep. No. 95–989, 95th Cong., 2d Sess. 66 (1978), reprinted in *Collier on Bankruptcy* App. Pt. 4–2008. This Court is satisfied that the relevant legislative history contemplated the taxes "incurred by the estate" to mean when the taxes were incurred and not to the existence of the estate as a separate taxable entity. *In re Knudsen*, 389 B.R. at 680. Therefore, post-petition taxes may qualify as administrative expenses under § 503(b)(1)(B)(i).

C. *Fickens have shown that § 1222(a)(2)(A) applies to their post-petition asset sales*

■ Section 1222(a)(2)(A) may apply to post-petition asset sales if the asset sale was performed pursuant to a confirmed plan. *See In re Knudsen*, 389 B.R. at 659. The "farming operation" is the farming operation under the confirmed plan. The debtor then must show only that the taxes arose out of some purpose of the plan. *Id.* at 663.

In this case, the plan states that "[Fickens] will sell all of the cattle owned by [Fickens]" with the proceeds going to Vectra Bank. Since the asset sale occurred pursuant to section 4.2.7 of the confirmed plan, § 1222(a)(2)(A) applies to the tax generated from the post-petition asset sale.

Case law is unanimous in finding that § 1222(a)(2)(A) applies to post-petition asset sales and the rationale remains sound. For the foregoing reasons, this Court concludes that the taxes generated from Fickens' post-petition asset sales under their confirmed Chapter 12 plan are entitled to beneficial (unsecured) treatment pursuant to § 1222(a)(2)(A).

II. *11 U.S.C. § 1222(a)(2)(A) applies to both the sale of the breeding livestock and the calf inventory*

■ IRS concedes that if § 1222(a)(2)(A) applies to post-petition asset sales, § 1222(a)(2)(A) applies to tax generated from the sale of the breeding livestock. The issue remains if Fickens may treat the taxes generated from the sale of the "calf inventory" as a beneficial (unsecured) claim.

IRS urges this Court to refuse to apply § 1222(a)(2)(A) to the calf inventory since it is not a capital asset and, thus, not "used in" the debtor's farming operation. IRS defines "use" as to "put into action or service." Webster's 9th Collegiate Dictionary 1299 (1986). IRS asserts that the plain meaning of "used in" is unambiguous and should be determinative in this situation. If this Court determines that "used in" is ambiguous, IRS contends, this Court should look to I.R.C. § 1231(b) which defines "property used in the trade or business." IRS claims that "used in the debtor's farming operation" expressly identifies assets that serve the purpose of the business operation, and not the products themselves. In short, IRS asserts that the calf inventory is a product of the farm and was not "used in" the debtor's farming operation.

Fickens urge this Court to recognize an expanded definition of "farm asset" to include any farm asset, including the calf inventory. Fickens claim that this was Congress' intent when enacting the statute. They also rely on *Knudsen* to show that § 1222(a)(2)(A) treatment applies to the sale of any farm asset that promoted some purpose of the debtor's plan. Fickens also point out that it is common practice of a cow/calf operation to retain heifer calves as replacements for culled cows,

thus converting an output of the farm to a capital asset of the farm.

The Knudsens were farmers who raised hogs for slaughter. *In re Knudsen*, 389 B.R. at 647. As part of their confirmed plan, the Knudsens sold the slaughter hogs and attempted to claim the generated tax was governed by § 1222(a)(2)(A) and was to be afforded beneficial (unsecured) treatment. IRS similarly argued in *Knudsen* that the slaughter hogs were not used in the debtor's farming operation "because the slaughter hogs were not used to create and finish a farm product for market, but were the farm products themselves, which were sold to produce farm income." *Id.* at 656.

"[T]he [*Knudsen*] court reads the phrase 'debtor's farming operation' in § 1222(a)(2)(A) to mean *the farming operation under the reorganization plan*, not the farming operation as it existed before the farmer's attempted to reorganize." *In re Knudsen*, 389 B.R. at 659. The sale of the slaughter hogs was completed pursuant to the plan. The *Knudsen* court held that the slaughter hogs were part of the "debtor's farming operation" under § 1222(a)(2)(A) and, therefore, the taxes generated from the sale of the slaughter hogs were entitled to beneficial (unsecured) treatment under § 1222(a)(2)(A). *Id.* at 664. It was unnecessary for the Knudsen court to delve into the applicability of § 1222(a)(2)(A) to different types of farm assets since the court concluded that the slaughter hogs were used for some purpose of the farming operation under the reorganization plan. *Id.* at 659.

Similarly, this Court need not recognize an expanded definition of "farm asset" or delve into the intricacies of cow/calf operations to determine what portion, if any, of the calf inventory could be deemed a capital asset. In fact, this Court need not rule on the definition of "capital asset." The

statute does not use the term "capital asset," and the Court will not so limit § 1222(a)(2)(A). This holding is also consistent with the unambiguous legislative history. 145 Cong. Rec. S750–02, 1999 WL 20426 (Jan. 20, 1999) (statement by Sen. Grassley on S.260).

IRS also urges this Court to consult I.R.C. § 1231(b) to determine if the calf inventory was "used in" the debtor's farming operation. IRS asserts that I.R.C. § 1231(b) defines "used in a trade or business" similar to a dictionary reading, which expressly identifies assets that serve the purpose of the business operation, and not the products themselves.

Internal Revenue Code § 1231(b) states that:

(1) General rule. The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in [I.R.C. § 167], held for more than 1 year, and real property used in the trade or business, held for more than 1 year, which is not—

. . .

(3) Livestock. Such term includes—

(A) cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and

(B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition.

I.R.C. § 1231(b).

IRS concedes that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context, but notes that other courts have consulted the Internal Revenue Code to inform the court on a

tax concept in the Bankruptcy Code. *United States v. Reorganized CF & I Frabricators of Utah, Inc.*, 518 U.S. 213, 224, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996).

This Court declines to consult the Internal Revenue Code to determine the meaning of the phrase "used in." The definition of "used in" under I.R.C. § 1231(b) relates to the farming operation before the bankruptcy petition was filed. This Court acknowledges the possibility that the calf inventory was not "used in" the farming operation before the bankruptcy petition was filed. There remains the distinct possibility that calves were, in fact, products of the farm and not "used in the debtor's farming operation." However, this Court refuses to rule on the function of the calf inventory before the petition was filed. The farming operation does not come to this Court before the bankruptcy was filed; the "farming operation" presented to this Court is post-petition.

The "farming operation" is the farming operation under the debtor's confirmed plan. The operation of the farm prior to the bankruptcy filing, and the possible distinction between assets "used in" the farming operation and those that were not, is irrelevant. After filing the bankruptcy petition and confirmation of the plan, the farming operation comes as one under the plan. So long as the assets were used for some purpose of the plan, the asset is deemed to be "used in the debtor's farming operation."

In the instant case, it is simply irrelevant if the calves were products of the farm or capital assets of the farming operation before the petition for bankruptcy protection was filed. Section 4.2.7 of Debtors' First Amended Chapter 12 Plan of Reorganization unambiguously states that "[t]he Debtors will sell all of the cattle owned by Debtors no later than December 31, 200[6] and pay the net proceeds to

Vectra Bank...." Both the breeding cattle and the calf inventory are included in the phrase "all of the cattle." The proceeds from the sale of the calves were used to pay Vectra Bank, and the asset sale was completed pursuant to the confirmed plan. The sale of the calves was clearly contemplated in the confirmed plan. For the foregoing reasons, the tax generated from the sale of the calves is afforded beneficial (unsecured) treatment under § 1222(a)(2)(A).

### III. Beneficial tax treatment should be allocated using the Marginal Method

In re Knudsen provides discussion of the two tax allocation options afforded beneficial (unsecured) treatment. The "marginal method"

> would have required [the debtors] to calculate a return for all income, then a second "pro forma" tax return removing all qualifying sales income, so that nonqualifying income would be taxed at lower marginal tax rates, resulting in a lower tax for income not entitled to beneficial treatment and greater likelihood that reorganization would be feasible.

389 B.R. at 665. The "proportional method" would require the taxpayer to

> prepare a tax return that recognizes total income and all deductions and exemptions and calculates the income tax based on all taxable income, then the IRS would calculate the percentage of total income attributable to sales of qualifying capital assets and the percentage of total income attributable to non-qualifying sources, and divide the income tax according to these percentages.

*Id.*

Fickens argue the marginal tax allocation method is appropriate since it would

provide the greatest benefit to farmers attempting to reorganize, and that the marginal method was Congress' intent when enacting Chapter 12. Fickens claim that the $38,965.00 tax for the sale of the breeding livestock and the calf inventory would be afforded beneficial (unsecured) treatment under the marginal tax allocation method.

IRS argues the proportional method is proper by noting that § 1222(a)(2)(A) does not require the Court to maximize the benefit to farmers by creating a legal fiction that the tax from the qualifying transactions were the "last dollars in" and subject to the highest marginal tax rate. IRS further notes the various potential tax problems with the marginal method. Under the proportional tax allocation method, IRS claims the proper amount of tax given beneficial (unsecured) treatment is $16,857.66, plus applicable interest and penalties, for the tax generated by the sale of the breeding livestock and the calf inventory. IRS also agrees that $38,965.00 of the tax from the breeding livestock and calf inventory should be afforded beneficial (unsecured) treatment under the marginal tax allocation method.

### A. Tax Allocation Method Survey

Three courts have ruled on the tax allocation method and there is no clear winner in the horserace to determine the tax allocation method. The Bankruptcy Court in *Knudsen* determined that the proportional method was appropriate, *In re Knudsen*, 356 B.R. 480, 487 (Bankr.N.D.Iowa 2006), but the District Court overruled the bankruptcy court to determine that marginal method was proper. *In re Knudsen*, 389 B.R. 643, 669 (N.D.Iowa 2008). The only other case to rule on the tax allocation method is the Unpublished Memorandum *In re Ricket* that determined that the proportional method is proper. *In re Ricket*, 2009 Bankr.LEXIS 17, at *7 (Unpublished Memorandum) (Bankr.D.Neb. Jan. 9, 2009). *Ricket* is heavily relied upon by IRS. *Id.*

The proportional method advocated in the *Knudsen* bankruptcy case and *Ricket*, relies on the proposition that the tax should be allocated without regard to the source of the tax. Prior to being overruled, the *Knudsen* bankruptcy court found that the proportional method "recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income. It divides the actual tax without regard to which sales produced the last dollar of income." *In re Knudsen*, 356 B.R. at 487 (Bankr.N.D.Iowa 2006). Similarly, the *Ricket* court stated that § 1222(a)(2)(A)

> does not provide that courts should maximize the taxes to which that beneficial treatment applies by creating a fiction that the income from the qualifying transactions were the "last dollars in" and, therefore subject to the highest marginal tax rate. Instead, as the bankruptcy court in *Knudsen* found, 356 B.R. at 487, and as the IRS advocates, the proportional method divides the actual tax without regard to which income sources produced the last dollar of income. It reduces the complications inherent in the marginal method as a result of the progressive marginal tax rates under the Internal Revenue Code and provides the simplest and most fair method for prorating the taxes since it treats every taxable dollar of income as equal to the extent that the Internal Revenue Code does so.

*In re Ricket*, 2009 Bankr.LEXIS 17, at *7.

The only court adopting the marginal method is the *Knudsen* District Court on appeal, which overruled the bankruptcy court. *In re Knudsen*, 389 B.R. 643, 669

(N.D.Iowa 2008). The court found that § 1222(a)(2)(A) is a priority-stripping provision applicable to more than tax claims and that the IRS and the bankruptcy court had a misconception that § 1222(a)(2)(A) was a tax provision in adopting the proportional method. *Id.* at 667. The court also stated that "the ambiguity as to allocation of taxes between priority and unsecured claims resulting from application of the provision to *tax* claims should be construed in accordance with the Bankruptcy Code and bankruptcy policy." *Id.* Furthermore,

> [b]y treating the proceeds of the transaction that qualify for beneficial treatment under § 1222(a)(2)(A), in effect, as the "last dollars in," and, therefore, subject to the highest marginal tax rate, the "marginal method" maximizes the percentage of the taxes to which beneficial (unsecured) treatment will apply, reducing the IRS's "veto" power, and making the debtor's reorganization plan more feasible and, hence, more confirmable.

*Id.* at 668.

### B. Tax Allocation Analysis

This Court agrees with *Ricket* that § 1222(a)(2)(A) does not provide for the tax allocation method, nor does § 1222(a)(2)(A) provide that courts should maximize the taxes which are afforded beneficial treatment. This Court is also convinced that the preferred tax allocation method should be the simplest method, and the method on which this Court decides should be the most fair under the law. This Court should also reduce complications with applying the tax allocation method. But the devil is in the details. These ancillary considerations of ease and fairness may yield a different result than the *Ricket* conclusion, as the Court finds here.

Section 1222(a)(2)(A) is silent to the tax allocation method and the statute may be interpreted with respect to the statutory construction and legislative history to find meaning if those tools provide better evidence of congressional intent. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 106, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007).

The legislative history illustrates Congress' intent to help farmers reorganize by reducing the IRS' veto power over a plan and to help farmers stay in the business of farming. 145 Cong. Rec. S750–02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement by Sen. Grassley on S.260). Additionally, § 1222(a)(2)(A) is a bankruptcy statute and should be interpreted with respect to the Bankruptcy Code and bankruptcy policy. *In re Knudsen*, 389 B.R. at 665–67. The tax allocation method this Court prefers must take into account the unambiguous legislative history, as well as the Bankruptcy Code and bankruptcy policy.

The marginal tax allocation method better accomplishes Congress' goals. *See In re Knudsen*, 389 B.R. at 669. The marginal method gives the largest amount of tax beneficial (unsecured) treatment, and therefore reduces the IRS' veto power over a plan and gives the farmer's plan the best chance of being confirmed. *In re Knudsen*, 389 B.R. at 668; 145 Cong. Rec. S750–02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement by Sen. Grassley on S.260). The proportional method advocated by IRS would reinstate much of the IRS's "veto" power over the debtor's Chapter 12 plan and much of the benefits of reorganization under Chapter 12 of the Code would not benefit the farmer. *Id.* Since it was unambiguously Congress' intent to assist the farmers in their reorganization efforts, the marginal tax allocation method is appropriate.

The marginal tax allocation method is also supported by bankruptcy policy to

give the tax from asset sales pursuant to a confirmed plan beneficial (unsecured) treatment. The Code gives reorganizing farmers the best fighting chance to successfully reorganize, and the marginal method assists farmers in their reorganization efforts. Additionally, ambiguities, or silence in this case, should be interpreted to "give the debtor the full measure of relief afforded by Congress." *Wright*, 311 U.S. at 279, 61 S.Ct. 196. Under bankruptcy policy, the marginal method aids the debtor in reorganization, and the marginal method is appropriate when allocating the tax.

The Knudsens as appellants also illustrate that the IRS does not always apply the proportional method. Reply Brief for Petitioner–Appellant at 14, *In re Knudsen*, No. C07–3011MWB (N.D. Iowa June 15, 2007), 2007 U.S. Dist. Ct. Briefs 3011. The IRS utilizes the marginal method to determine estate taxes for special use valuation under 26 U.S.C. § 2032A. *Id.* The Knudsens note that the estate tax, like the income tax, is a graduated tax. Under § 2032A, in many cases farmland is passed from one generation to the next by a "qualified heir." IRS requires the estate to report only the Special Use Value, and not the Fair Market Value, on Form 706 to determine the estate tax due.

This is similar to the instant case where Fickens determine the priority tax by completing a pro-forma income tax return that did not report the income from the asset sale. The Knudsen court recognized this example, without further discussing it. *In re Knudsen*, 389 B.R. at 667 ("The Knudsens also point out that the IRS uses a marginal method to determine estate taxes for special use valuation, undermining the IRS's reliance on a different method here.").

The tax on prior transfers ("TPT") under I.R.C. § 2013 also illustrates a situation where the IRS requires computation of tax using the marginal method. Robert J. Stommel & Lester B. Law, *Planning to Maximize the § 2013 Credit*, 72 Fla. Bar J. 66 (1998). "[T]he TPT credit is a credit applied to the federal (and not state) estate tax liability of the decedent's estate equal to the amount of the federal estate tax deemed paid on property transferred to the decedent from the transferor." *Id.* at 66. The tax is the amount of federal estate tax attributable to the transferred property in the decedent's estate. The tax is computed as the lesser of the "average" or "pro rata" method of tax allocation and the "with and without" or "marginal" method of tax allocation. *Id.* at 69. With respect to TPT, IRS contemplates that the taxpayer compute the tax under the marginal method, and if the marginal method results in a lower tax than the "pro rata" or proportional method, that is the tax to be paid. In this instance, the taxpayer would be assessed at the level determined by the marginal tax allocation method. Although the observation that IRS does not always use the proportional method when allocating the tax is not determinative, it does illustrate some exceptions where the IRS does not apply what would be the proportional method to treat each dollar of income as the same.

The application of the marginal method may also be easier than the proportional method and employs sound policy. The marginal method requires the taxpayer to calculate a tax return for all income and a "pro forma" tax return removing all qualifying income so that the non-qualifying income would be taxed at lower marginal rates. *In re Knudsen*, 389 B.R. at 665. The marginal method appears simpler than requiring IRS to divide the income tax according to the calculation of the percentage of income attributable to the qualified asset sale. Applying the marginal

method is also sound policy for the debtor to retain more control and obtain greater certainty over the tax reporting process. Once the tax returns are completed, *inter alia,* the debtor is able to begin constructing a bankruptcy plan. The debtor does not need to wait for IRS to calculate the tax and aids the Court in confirming the debtor's plan. Delays in the debtor receiving the tax calculation from IRS may unnecessarily delay the confirmation of the plan and may also harm other creditors.

Accordingly, this Court finds that the marginal method described in *In re Knudsen,* 389 B.R. at 665, should be used when allocating the tax under § 1222(a)(2)(A). Under the marginal method for the tax generated from the sale of both the breeding livestock and the calf inventory, the parties agree that $38,965.00 of tax is given beneficial (unsecured) treatment under § 1222(a)(2)(A).

**Conclusion**

In accordance with the foregoing, it is

**HEREBY ORDERED** that the Plaintiffs' Motion for Summary Judgment (Docket #20) is GRANTED. The Court concludes as a matter of law that

1. 11 U.S.C. § 1222(a)(2)(A) applies to post-petition asset sales
2. The tax generated from the sale of the "calf inventory" is governed by 11 U.S.C. § 1222(a)(2)(A)
3. The marginal tax allocation method should be used, resulting in beneficial (unsecured) treatment of $38,965.00.

It is

**FURTHER ORDERED** that the Defendant's Motion for Summary Judgment (Docket #22) is DENIED.