Justice Breyer
delivered the opinion of the Court.
A federal statute sets forth a method that the Secretary of Education is to use when determining whether a State’s public school funding program “equalizes expenditures” throughout the State. The statute instructs the Secretary to calculate the disparity in per-pupil expenditures among local school districts in the State. But, when doing so, the Secretary is to “disregard” school districts “with per-pupil expenditures . . . above the. 95th percentile or below the 5th percentile of such expenditures. ..in the State.” 20 U. S. C. § 7709(b)(2)(B)(i) (emphasis added).
The question before us is whether the emphasized statutory language permits the Secretary to identify the school districts that should be “disregardfed]” by looking to the number of the district’s pupils as well as to the size of the district’s expenditures per pupil. We conclude that it does.
I
A
The federal Impact Aid Act, 108 Stat. 3749, as amended, 20 U. S. C. § 7701 et seq., provides financial assistance to local school districts whose ability to finance public school education is adversely affected by a federal presence. Federal aid is available to districts, for example, where a significant amount of federal land is exempt from local property taxes, or where the federal presence is responsible for an increase in school-age children (say, of armed forces personnel) whom *85 local schools must educate. See § 7701 (2000 ed. and Supp. IV). The statute typically prohibits a State from offsetting this federal aid by reducing its own state aid to the local district. If applied without exceptions, however, this prohibition might unreasonably interfere with a state program that seeks to equalize per-pupil expenditures throughout the State, for instance, by preventing the state program from taking account of a significant source of federal funding that some local school districts receive. The statute consequently contains an exception that permits a State to compensate for federal impact aid where “the Secretary [of Education] determine^] and certifies . . . that the State has in effect a program of State aid that equalizes expenditures for free public education among local [school districts] in the State.” § 7709(b)(1) (2000 ed., Supp. IV) (emphasis added).
The statute sets out a formula that the Secretary of Education must use to determine whether a state aid program satisfies the federal “equalization]” requirement. The formula instructs the Secretary to compare the local school district with the greatest per-pupil expenditures to the school district with the smallest per-pupil expenditures to see whether the former exceeds the latter by more than 25 percent. So long as it does not, the state aid program qualifies as a program that “equalizes expenditures.” More specifically the statute provides that “a program of state aid” qualifies, i. e., it “equalizes expenditures” among local school districts if,
“in the second fiscal year preceding the fiscal year for which the determination is made, the amount of per-pupil expenditures made by [the local school district] with the highest such per-pupil expenditures . . . did not exceed the amount of such per-pupil expenditures made by [the local school district] with the lowest such expenditures ... by more than 25 percent.” § 7709(b)(2)(A) (2000 ed.).
*86 The statutory provision goes on to set forth what we shall call the “disregard” instruction. It states that, when “making” this “determination,” the “Secretary shall... disregard [school districts] with per-pupil expenditures ... above the 95th percentile or below the 5th percentile of such expenditures.” § 7709(b)(2)(B)(i) (emphasis added). It adds that the Secretary shall further
“take into account the extent to which [the state program reflects the special additional costs that some school districts must bear when they are] geographically isolated [or when they provide education for] particular types of students, such as children with disabilities.” § 7709(b)(2)(B)(ii).
B
This case requires us to decide whether the Secretary’s present calculation method is consistent with the federal statute’s “disregard” instruction. The method at issue is contained in a set of regulations that the Secretary first promulgated 30 years ago. Those regulations essentially state the following:
When determining whether a state aid program “equalizes expenditures” (thereby permitting the State to reduce its own local funding on account of federal impact aid), the Secretary will first create a list of school districts ranked in order of per-pupil expenditure. The Secretary will then identify the relevant percentile cutoff point on that list on the basis of a specific (95th or 5th) percentile of student population — essentially identifying those districts whose students account for the 5 percent of the State’s total student population that lies at both the high and low ends of the spending distribution. Finally the Secretary will compare the highest spending and lowest spending school districts of those that remain to see whether they satisfy the statute’s requirement that the disparity between them not exceed 25 percent.
*87 The regulations set forth this calculation method as follows:
“ [D]eterminations of disparity in current expenditures ... per-pupil are made by—
“(i) Ranking all [of the State’s school districts] on the basis of current expenditures .. . per pupil [in the relevant statutorily determined year];
“(ii) Identifying those [school districts] that fall at the 95th and 5th percentiles of the total number of pupils in attendance [at all the State’s school districts taken together]; and
“(iii) Subtracting the lower current expenditure . . . per pupil figure from the higher for those [school districts] identified in paragraph (ii) and dividing the difference by the lower figure.” 34 CFR pt. 222, subpt. K, App., ¶ 1 (2006).
The regulations also provide an illustration of how to perform the calculation:
“In State X, after ranking all [school districts] in order of the expenditures per pupil for the [statutorily determined] fiscal year in question, it is ascertained by counting the number of pupils in attendance in those [school districts] in ascending order of expenditure that the 5th percentile of student population is reached at [school district A] with a per pupil expenditure of $820, and that the 95th percentile of student population is reached at [school district B] with a per pupil expenditure of $1,000. The percentage disparity between the 95th percentile and the 5th percentile [school districts] is 22 percent ($1000 - $820 = $180/$820).” Ibid.
Because 22 percent is less than the statutory “25 percent” requirement, the state program in the example qualifies as a program that “equalizes expenditures.”
*88 c
This case concerns the Department of Education’s application of the Secretary’s regulations to New Mexico’s local district aid program in respect to fiscal year 2000. As the regulations require, Department officials listed each of New Mexico’s 89 local school districts in order of per-pupil spending for fiscal year 1998. (The calculation in New Mexico’s case was performed, as the statute allows, on the basis of per-pupil revenues, rather than per-pupil expenditures. See 20 U. S. C. § 7709(b)(2)(A). See also Appendix B, infra. For ease of reference we nevertheless refer, in respect to New Mexico’s figures and throughout the opinion, only to “per-pupil expenditures.”) After ranking the districts, Department officials excluded 17 school districts at the top of the list because those districts contained (cumulatively) less than 5 percent of the student population; for the same reason, they excluded an additional 6 school districts at the bottom of the list.
The remaining 66 districts accounted for approximately 90 percent of the State’s student population. Of those, the highest ranked district spent $3,259 per student; the lowest ranked district spent $2,848 per student. The difference, $411, was less than 25 percent of the lowest per-pupil figure, namely, $2,848. Hence, the officials found that New Mexico’s local aid program qualifies as a program that “equalizes expenditures.” New Mexico was therefore free to offset federal impact aid to individual districts by reducing state aid to those districts.
Two of New Mexico’s public school districts, Zuni Public School District and Gallup-McKinley County Public School District (whom we shall collectively call Zuni), sought further agency review of these findings. Zuni conceded that the Department’s calculations were correct in terms of the Department’s own regulations. Zuni argued, however, that the regulations themselves are inconsistent with the authorizing statute. That statute, in its view, requires the Depart *89 ment to calculate the 95th and 5th percentile cutoffs solely on the basis of the number of school districts (ranked by their per-pupil expenditures), without any consideration of the number of pupils in those districts. If calculated as Zuni urges, only 10 districts (accounting for less than 2 percent of all students) would have been identified as the outliers that the statute instructs the Secretary to disregard. The difference, as a result, between the highest and lowest per-pupil expenditures of the remaining districts (26.9 percent) would exceed 25 percent. Consequently, the statute would forbid New Mexico to take account of federal impaet aid as it decides how to equalize school funding across the State. See N. M. Stat. Ann. § 22-8-1 et seq. (2006).
A Department of Education Administrative Law Judge rejected Zuni’s challenge to the regulations. The Secretary of Education did the same. Zuni sought review of the Secretary’s decision in the Court of Appeals for the Tenth Circuit. 393 F. 3d 1158 (2004). Initially, a Tenth Circuit panel affirmed the Secretary’s determination by a split vote (2 to 1). Subsequently, the full Court of Appeals vacated the panel’s decision and heard the matter en banc. The 12-member en banc court affirmed the Secretary but by an evenly divided court (6 to 6). 437 F. 3d 1289 (2006) (per curiam). Zuni sought certiorari. We agreed to decide the matter.
II
A
Zuni’s strongest argument rests upon the literal language of the statute. Zuni concedes, as it must, that if the language of the statute is open or ambiguous — that is, if Congress left a “gap” for the agency to fill — then we must uphold the Secretary’s interpretation as long as it is reasonable. See Chevron U. S. A Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-843 (1984). See also Christensen v. Harris County, 529 U. S. 576, 589, n. (Scalia, J., concurring in part and concurring in judgment). For pur *90 poses of exposition, we depart from a normal order of discussion, namely, an order that first considers Zuni’s statutory language argument. See Barnhart v. Sigmon Coal Co., 534 U. S. 438, 450 (2002). Instead, because of the technical nature of the language in question, we shall first examine the provision’s background and basic purposes. That discussion will illuminate our subsequent analysis in Part II-B, infra. It will also reveal why Zuni concentrates its argument upon language alone.
Considerations other than language provide us with unusually strong indications that Congress intended to leave the Secretary free to use the calculation method before us and that the Secretary’s chosen method is a reasonable one. For one thing, the matter at issue — i. e., the calculation method for determining whether a state aid program “equalizes expenditures” — is the kind of highly technical, specialized interstitial matter that Congress often does not decide itself, but delegates to specialized agencies to decide. See United States v. Mead Corp., 533 U. S. 218, 234 (2001); cf. MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U. S. 218, 231 (1994); Christensen, supra, at 589, n. (opinion of Scalia, J.).
For another thing, the history of the statute strongly supports the Secretary. Congress first enacted an impact aid “equalization” exception in 1974. The exception originally provided that the “ter[m]... ‘equalizing] expenditures’ . . . shall be defined by the [Secretary].” 20 U. S. C. § 240(d)(2)(B) (1970 ed., Supp. IV). Soon thereafter, in 1976, the Secretary promulgated the regulation here at issue defining the term “equalizing expenditures” in the manner now before us. See Part I-B, supra. As far as we can tell, no Member of Congress has ever criticized the method the 1976 regulation sets forth nor suggested at any time that it be revised or reconsidered.
The present statutory language originated in draft legislation that the Secretary himself sent to Congress in 1994. *91 With one minor change (irrelevant to the present calculation controversy), Congress adopted that language without comment or clarification. No one at the time — no Member of Congress, no Department of Education official, no school district or State — expressed the view that this statutory language (which, after all, was supplied by the Secretary) was intended to require, or did require, the Secretary to change the Department’s system of calculation, a system that the Department and school districts across the Nation had followed for nearly 20 years, without (as far as we are told) any adverse effect.
Finally, viewed in terms of the purpose of the statute’s disregard instruction, the Secretary’s calculation method is reasonable, while the reasonableness of a method based upon the number of districts alone (Zuni’s proposed method) is more doubtful. When the Secretary (then Commissioner) of Education considered the matter in 1976, he explained why that is so.
Initially the Secretary pointed out that the “exclusion of the upper and bottom 5 percentile school districts is based upon the accepted principle of statistical evaluation that such percentiles usually represent unique or noneharacteristic situations.” 41 Fed. Reg. 26320 (1976) (emphasis added). That purpose, a purpose to exclude statistical outliers, is evident in the language of the present statute. The provision uses the technical term “percentile”; it refers to cutoff numbers (“95th” and “5th”) often associated with scientific calculations; and it directly precedes another statutory provision that tells the Secretary to account for those districts, from among the middle 5th to 95th percentile districts, that remain “noncharacteristic” in respect to geography or the presence of special students (such as disabled students). See 20 U. S. C. §§7709(b)(2)(B)(iMii) (2000 ed.).
The Secretary added that under the regulation’s calculation system the “percentiles” would be “determined on the basis of numbers of pupils and not on the basis of numbers *92 of districts.” 41 Fed. Reg. 26324. He said that to base “an exclusion on numbers of districts” alone “would act to apply the disparity standard in an unfair and inconsistent manner among States.” Ibid. He then elaborated upon his concerns:
“The purpose of the exclusion is to eliminate those anomalous characteristics of a distribution of expenditures. In States with a small number of large districts, an exclusion based on percentage of school districts might exclude from the measure of disparity a substantial percentage of the pupil population in those States. Conversely, in States with large numbers of small districts, such an approach might exclude only an insignificant fraction of the pupil population and would not exclude anomalous characteristics.” Ibid.
To understand the Secretary’s first problem, consider an exaggerated example, say, a State with 80 school districts of unequal size. Suppose 8 of the districts include urban areas and together account for 70 percent of the State’s students, while the remaining 72 districts include primarily rural areas and together account for 30 percent of the State’s students. If the State’s greatest funding disparities are among the 8 urban districts, Zuni’s calculation method (which looks only at the number of districts and ignores their size) would require the Secretary to disregard the system’s 8 largest districts (i. e., 10 percent of the number 80) even though those 8 districts (because they together contain 70 percent of the State’s pupils) are typical of, indeed characterize, the State’s public school system. It would require the Secretary instead to measure the system’s expenditure equality by looking only to noncharacteristic districts that are not representative of the system as a whole, indeed districts accounting for only 30 percent of the State’s pupils. Thus, according to Zuni’s method, the Secretary would have to certify a state aid program as one that “equalizes expenditures” *93 even if there were gross disparities in per-pupil expenditures among urban districts accounting for 70 percent of the State’s students. By way of contrast, the Secretary’s method, by taking into account a district’s size as well as its expenditures, would avoid a calculation that would produce results so contrary to the statute’s objective.
To understand the Secretary’s second problem consider this very case. New Mexico’s 89 school districts vary significantly in respect to the number of pupils each contains. Zuni’s calculation system nonetheless forbids the Secretary to discount more than 10 districts — 10 percent of the total number of districts (rounded up). But these districts taken together account for only 1.8 percent of the State’s pupils. To eliminate only those districts, instead of eliminating districts that together account for 10 percent of the State’s pupils, risks resting the “disregard” calculation upon a few particularly extreme noncharacteristic districts, yet again contrary to the statute’s intent.
Thus, the history and purpose of the disregard instruction indicate that the Secretary’s calculation formula is a reasonable method that carries out Congress’ likely intent in enacting the statutory provision before us.
B
But what of the provision’s literal language? The matter is important, for normally neither the legislative history nor the reasonableness of the Secretary’s method would be determinative if the plain language of the statute unambiguously indicated that Congress sought to foreclose the Secretary’s interpretation. And Zuni argues that the Secretary’s formula could not possibly effectuate Congress’ intent since the statute’s language literally forbids the Secretary to use such a method. Under this Court’s precedents, if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis. See Chevron, 467 U. S., at 842-843. A customs *94 statute that imposes a tariff on “clothing” does not impose a tariff on automobiles, no matter how strong the policy arguments for treating the two kinds of goods alike. But we disagree with Zuni’s conclusion, for we believe that the Secretary’s method falls within the scope of the statute’s plain language.
That language says that, when the Secretary compares (for a specified fiscal year) “the amount of per-pupil expenditures made by” (1) the highest-per-pupil-expenditure district and (2) the lowest-per-pupil-expenditure district, “the Secretary shall... disregard” local school districts “with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures in the State.” 20 U. S. C. §§ 7709(b)(2)(A), (B)(i). The word “such” refers to “per-pupil expenditures” (or more precisely to “per-pupil expenditures” in the test year specified by the statute). The question then is whether the phrase “above the 95th percentile ... of.. . [per pupil] expenditures” permits the Secretary to calculate percentiles by (1) ranking local districts, (2) noting the student population of each district, and (3) determining the cutoff point on the basis of districts containing 95 percent (or 5 percent) of the State’s students.
Our answer is that this phrase, taken with absolute literalness, limits the Secretary to calculation methods that involve “per-pupil expenditures.” But it does not tell the Secretary which of several different possible methods the Department must use. Nor does it rule out the present formula, which distributes districts in accordance with per-pupil expenditures, while essentially weighting each district to reflect the number of pupils it contains.
Because the statute uses technical language (e. g., “percentile”) and seeks a technical purpose (eliminating uncharacteristic, or outlier, districts), we have examined dictionary definitions of the term “percentile.” See 41 Fed. Reg. 26320 (Congress intended measurements based upon an “accepted principle of statistical evaluation” (emphasis added)). *95 Those definitions make clear that “percentile” refers to a division of a distribution of some population into 100 parts. Thus, Webster’s Third New International Dictionary 1675 (1961) (Webster’s Third) defines “percentile” as “the value of the statistical variable that marks the boundary between any two consecutive intervals in a distribution of 100 intervals each containing one percent of the total population.” A standard economics dictionary gives a similar definition for “percentiles”:
“The values separating hundredth parts of a distribution, arranged in order of size. The 99th percentile of the income distribution, for example, is the income level such that only one per cent of the population have larger incomes.” J. Black, A Dictionary of Economics 348-349 (2d ed. 2002).
A dictionary of mathematics states: “The n-th percentile is the value Xniiw such that n per cent of the population is less than or equal to XnJioo” It adds that “[t]he terms can be modified, though not always very satisfactorily, to be applicable to a discrete random variable or to a large sample ranked in ascending order.” C. Clapham & J. Nicholson, The Concise Oxford Dictionary of Mathematics 378-379 (3d ed. 2005) (emphasis deleted). The American Heritage Science Dictionary 468 (2005) explains that a percentile is “[a]ny of the 100 equal parts into which the range of the values of a set of data can be divided in order to show the distribution of those values.” And Merriam-Webster’s Medical Desk Dictionary 612 (2002) describes percentile as “a value on a scale of one hundred that indicates the percent of a distribution that is equal to or below it.”
These definitions, mainstream and technical, all indicate that, in order to identify the relevant percentile cutoffs, the Secretary must construct a distribution of values. That distribution will consist of a “population” ranked according to a characteristic. That characteristic takes on a “value” for *96 each member of the relevant population. The statute’s instruction to identify the 95th and 5th “percentile of such expenditures” makes clear that the relevant characteristic for ranking purposes is per-pupil expenditure during a particular year. But the statute does not specify precisely what population is to be “distributed” (i. e., ranked according to the population’s corresponding values for the relevant characteristic). Nor does it set forth various details as to how precisely the distribution is to be constructed (as long as it is ranked according to the specified characteristic).
But why is Congress’ silence in respect to these matters significant? Are there several different populations, relevant here, that one might rank according to “per-pupil expenditures” (and thereby determine in several different ways a cutoff point such that “n percent of [that] population” falls, say, below the percentile cutoff)? We are not experts in statistics, but a statistician is not needed to see what the dictionary does not say. No dictionary definition we have found suggests that there is any single logical, mathematical, or statistical link between, on the one hand, the characterizing data (used for ranking purposes) and, on the other hand, the nature of the relevant population or how that population might be weighted for purposes of determining a percentile cutoff.
Here, the Secretary has distributed districts, ranked them according to per-pupil expenditure, but compared only those that account for 90 percent of the State’s pupils. Thus, the Secretary has used — as her predecessors had done for a quarter century before her — the State’s students as the relevant population for calculating the specified percentiles. Another Secretary might have distributed districts, ranked them by per-pupil expenditure, and made no reference to the number of pupils (a method that satisfies the statute’s language but threatens the problems the Secretary long ago identified, see 41 Fed. Reg. 26324; supra, at 91-93). A third Secretary might have distributed districts, ranked them by *97 per-pupil expenditure, but compared only those that account for 90 percent of total pupil expenditures in the State. A fourth Secretary might have distributed districts, ranked them by per-pupil expenditure, but calculated the 95th and 5th percentile cutoffs using the per-pupil expenditures of all the individual schools in the State. See 41 Fed. Reg. 26324 (considering this system of calculation). A fifth Secretary might have distributed districts, ranked them by per-pupil expenditure, but accounted in his disparity calculation for the sometimes significant differences in per-pupil spending at different grade levels. See 34 CFR § 222.162(b)(1) (2006) (authorizing such a system); id., pt. 222, subpt. K, App. See also Appendix B, infra.
Each of these methods amounts to a different way of determining which districts fall between the 5th and 95th “percentile of per-pupil expenditures.” For purposes of that calculation, they each adopt different populations — students, districts, schools, and grade levels. Yet, linguistically speaking, one may attribute the characteristic of per-pupil expenditure to each member of any such population (though the values of that characteristic may be more or less readily available depending on the chosen population, see 41 Fed. Reg. 26324). Hence, the statute’s literal language covers any or all of these methods. That language alone does not tell us (or the Secretary of Education), however, which method to use.
Justice Scalia’s claim that this interpretation “defies any semblance of normal English” depends upon its own definition of the word “per.” That word, according to the dissent, “connotes ... a single average figure assigned to a unit the composite members of which are individual pupils.” Post, at 113 (emphasis deleted). In fact, the word “per” simply means “[f]or each” or “for every.” Black’s Law Dictionary 1171 (8th ed. 1999); see Webster’s Third 1674. Thus, nothing in the English language prohibits the Secretary from considering expenditures for each individual pupil in a district when *98 instructed to look at a district’s “per-pupil expenditures.” The remainder of the dissent’s argument, colorful language to the side, rests upon a reading of the statutory language that ignores its basic purpose and history.
We find additional evidence for our understanding of the language in the fact that Congress, in other statutes, has clarified the matter here at issue thereby avoiding comparable ambiguity. For example, in a different education-related statute, Congress refers to “the school at the 20th percentile in the State, based on enrollment, among all schools ranked by the percentage of students at the proficient level.” 20 U.S.C. §6311(b)(2)(E)(ii) (2000 ed., Supp. IV) (emphasis added). In another statute fixing charges for physicians services, Congress specified that the maximum charge “shall be the 50th percentile of the customary charges for the service (weighted by the frequency of the service) performed by nonparticipating physicians in the locality during the [prior] 12-month period.” 42 U. S. C. § 1395u(j)(l)(C)(v) (2000 ed.) (emphasis added). In these statutes Congress indicated with greater specificity how a percentile should be determined by stating precisely not only which data values are of interest, but also (in the first) the population that is to be distributed and (in the second) the weightings needed to make the calculation meaningful and to avoid counterproductive results. In the statute at issue here, however, Congress used more general language (drafted by the Secretary himself), which leaves the Secretary with the authority to resolve such subsidiary matters at the administrative level.
We also find support for our view of the language in the more general circumstance that statutory “[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context.” Brown v. Gardner, 513 U. S. 115, 118 (1994). See also FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 132-133 (2000) (“[mjeaning — or ambiguity — of certain words or phrases may only become evident *99 when placed in context” (emphasis added)). That may be so even if statutory language is highly technical. After all, the scope of what seems a precise technical chess instruction, such as “you must place the queen next to the king,” varies with context, depending, for example, upon whether the instructor is telling a beginner how to set up the board or telling an advanced player how to checkmate an opponent. The dietionary acknowledges that, when interpreting technical statistical language, the purpose of the exercise matters, for it says that “quantile,” “percentile,” “quartile,” and “decile” are “terms [that] can be modified, though not always very satisfactorily, to be applicable to ... a large sample ranked in ascending order.” Oxford Dictionary of Mathematics, at 378-379.
Thus, an instruction to “identify schools with average scholastic aptitude test scores below the 5th percentile of such scores” may vary as to the population to be distributed, depending upon whether the context is one of providing additional counseling and support to students at low-performing schools (in which ease the relevant population would likely consist of students), or one of identifying unsuccessful learning protocols at low-performing schools (in which case the appropriate population may well be the schools themselves). Context here tells us that the instruction to identify school districts with “per-pupil expenditures” above the 95th percentile “of such expenditures” is similarly ambiguous, because both students and school districts are of concern to the statute. Accordingly, the disregard instruction can include within its scope the distribution of a ranked population that consists of pupils (or of school districts weighted by pupils) and not just a ranked distribution of unweighted school districts alone.
Finally, we draw reassurance from the fact that no group of statisticians, nor any individual statistician, has told us directly in briefs, or indirectly through citation, that the lan *100 guage before us cannot be read as we have read it. This circumstance is significant, for the statutory language is technical, and we are not statisticians. And the views of experts (or their absence) might help us understand (though not control our determination of) what Congress had in mind.
The upshot is that the language of the statute is broad enough to permit the Secretary’s reading. That fact requires us to look beyond the language to determine whether the Secretary’s interpretation is a reasonable, hence permissible, implementation of the statute. See Chevron, 467 U. S., at 842-843. For the reasons set forth in Part II-A, supra, we conclude that the Secretary’s reading is a reasonable reading. We consequently find the Secretary’s method of calculation lawful.
The judgment of the Tenth Circuit is affirmed.

It is so ordered.

APPENDIXES TO OPINION OF THE COURT
A
We set out the relevant statutory provisions and accompanying regulations in full. The reader will note that in the text of our opinion, for purposes of exposition, we use the term “local school districts” where the statute refers to “local educational agencies.” We also disregard the statute’s frequent references to local “revenues” because those references do not raise any additional considerations germane to this case.
Impact Aid Program, 20 U. S. C. § 7709 (2000 ed. and Supp. IV) (state consideration of payments in providing state aid):
“(a) General prohibition
“Except as provided in subsection (b) of this section, a State may not—
“(1) consider payments under this subchapter in determining for any fiscal year—
*101 “(A) the eligibility of a local educational agency for State aid for free public education; or
“(B) the amount of such aid; or
“(2) make such aid available to local educational agencies in a manner that results in less State aid to any local educational agency that is eligible for such payment than such agency would receive if such agency were not so eligible.
“(b) State equalization plans
“(1) In general
“A State may reduce State aid to a local educational agency that receives a payment under section 7702 or 7703(b) of this title (except the amount calculated in excess of 1.0 under section 7703(a)(2)(B) of this title and, with respect to a local educational agency that receives a payment under section 7703(b)(2) of this title, the amount in excess of the amount that the agency would receive if the agency were deemed to be an agency eligible to receive a payment under section 7703(b)(1) of this title and not section 7703(b)(2) of this title) for any fiscal year if the Secretary determines, and certifies under subsection (c)(3)(A) of this section, that the State has in effect a program of State aid that equalizes expenditures for free public education among local educational agencies in the State.
“(2) Computation
“(A) In general
“For purposes of paragraph (1), a program of State aid equalizes expenditures among local educational agencies if, in the second fiscal year preceding the fiscal year for which the determination is made, the amount of per-pupil expenditures made by, or per-pupil revenues available to, the local educational agency in the State with the highest such per-pupil expenditures or revenues did not exceed *102 the amount of such per-pupil expenditures made by, or per-pupil revenues available to, the local educational agency in the State with the lowest such expenditures or revenues by more than 25 percent. “(B) Other factors
“In making a determination under this subsection, the Secretary shall—
“(i) disregard local educational agencies with per-pupil expenditures or revenues above the 95th percentile or below the 5th percentile of such expenditures or revenues in the State; and “(ii) take into account the extent to which a program of State aid reflects the additional cost of providing free public education in particular types of local educational agencies, such as those that are geographically isolated, or to particular types of students, such as children with disabilities.”
B
34 CFR §222.162 (2006) (What disparity standard must a State meet in order to be certified, and how are disparities in current expenditures or revenues per pupil measured?):
“(a) Percentage disparity limitation. The Secretary considers that a State aid program equalizes expenditures if the disparity in the amount of current expenditures or revenues per pupil for free public education among LEAs in the State is no more than 25 percent. In determining the disparity percentage, the Secretary disregards LEAs with per pupil expenditures or revenues above the 95th or below the 5th percentile of those expenditures or revenues in the State. The method for calculating the percentage of disparity in a State is in the appendix to this subpart.
“(b)(1) Weighted average disparity for different grade level groups. If a State requests it, the Secretary *103 will make separate disparity computations for different groups of LEAs in the State that have similar grade levels of instruction.
“(2) In those cases, the weighted average disparity for all groups, based on the proportionate number of pupils in each group, may not be more than the percentage provided in paragraph (a) of this section. The method for calculating the weighted average disparity percentage is set out in the appendix to this subpart.
“(c) Per pupil figure computations. In calculating the current expenditures or revenue disparities under this section, computations of per pupil figures are made on one of the following bases:
“(1) The per pupil amount of current expenditures or revenue for an LEA is computed on the basis of the total number of pupils receiving free public education in the schools of the agency. The total number of pupils is determined in accordance with whatever standard measurement of pupil count is used in the State.”
34 CFR pt. 222, subpt. K, App. (2006) (Methods of Calculations for Treatment of Impact Aid Payments Under State Equalization Programs):
“The following paragraphs describe the methods for making certain calculations in conjunction with determinations made under the regulations in this subpart. Except as otherwise provided in the regulations, these methods are the only methods that may be used in making these calculations.
“1. jDeterminations of disparity standard compliance under §222.162(b)(1).
“(a) The determinations of disparity in current expenditures or revenue per pupil are made by—
“(i) Ranking all LEAs having similar grade levels within the State on the basis of current expenditures or *104 revenue per pupil for the second preceding fiscal year before the year of determination;
“(ii) Identifying those LEAs in each ranking that fall at the 95th and 5th percentiles of the total number of pupils in attendance in the schools of those LEAs; and “(iii) Subtracting the lower current expenditure or revenue per pupil figure from the higher for those agencies identified in paragraph (ii) and dividing the difference by the lower figure.
“(b) In cases under § 222.162(b), where separate computations are made for different groups of LEAs, the disparity percentage for each group is obtained in the manner described in paragraph (a) above. Then the weighted average disparity percentage for the State as a whole is determined by—
“(i) Multiplying the disparity percentage for each group by the total number of pupils receiving free public education in the schools in that group;
“(ii) Summing the figures obtained in paragraph (b)(i); and
“(iii) Dividing the sum obtained in paragraph (b)(ii) by the total number of pupils for all the groups.
EXAMPLE
Group 1 (grades 1-6), 80,000 pupils x 18% = 14,400
Group 2 (grades 7-12), 100,000 pupils x 22% = 22,000
Group 3 (grades 1-12), 20,000 pupilsX35% = 7,000
Total 200,000 pupils.................................................... 43,400
43,400/200,000=21.70% Disparity „