**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FORT PECK HOUSING AUTHORITY,

     Plaintiff – Appellee/Cross-
     Appellant,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT; ALPHONSO
JACKSON, Secretary of Housing and
Urban Development; MICHAEL LIU,
Assistant Secretary for Public and Indian
Housing,

     Defendants – Appellants/Cross-
     Appellees.

------------------------------

OGLALA SIOUX (LAKOTA) HOUSING;
SICANGU WICOTI AWANYAKAPI
CORPORATION; TURTLE MOUNTAIN
HOUSING AUTHORITY; LOWER
BRULE HOUSING AUTHORITY,

     Movants.

No. 06-1425 & 06-1447
(D. Colo.)
(D.C. No. 05-CV-18-RPM)

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

Before **LUCERO**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

This case involves the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA), 25 U.S.C. §§ 4101-4243.[1]  In that act Congress directed the Department of Housing and Urban Development (HUD) to enter into a collaborative process with interested Native American tribes and their designated housing entities (Tribal Housing Entities) to adopt regulations providing for an annual, equitable distribution of available funds for low-income housing assistance.  A regulation promulgated in 1998 disqualified funding for housing units which were no longer owned or operated by a Tribal Housing Entity.  24 C.F.R. § 1000.318.  In subsequent years HUD mistakenly overpaid Fort Peck Housing Authority (Fort Peck) for dwelling units it no longer owned or operated.  After discovering its oversight HUD demanded a refund.  Fort Peck partially repaid HUD, but then sued, alleging the "owned or operated" regulation was invalid.  The district court agreed but determined Fort Peck was not entitled to a return of all monies it had already refunded.  HUD appealed from the court's invalidation of its regulation and Fort Peck cross-appealed from the denial of return of its repayments. We reverse the invalidation of HUD's regulation, dismiss Fort Peck's cross-appeal, and remand.

---

[1] Congress has since amended NAHASDA, including the statutory provisions at issue here.  *See* Native American Housing Assistance and Self-Determination Reauthorization Act of 2008, Pub. L. No. 110-411, 122 Stat. 4319 (2008).  This Order and Judgment only considers the 2002 version of NAHASDA.

**I.**

A.      <u>Relevant Statutory and Regulatory History</u>

Prior to 1997,[2] financial assistance for low-income housing programs arose through a number of separate programs under the Housing Act of 1937. *See* Implementation of the Native American Housing Assistance and Self-Determination Act of 1996, Proposed Rule, 62 Fed. Reg. 35,718, 35,719 (July 2, 1997). Some programs helped Indian families afford low-income rental options and others allowed families to purchase housing through lease-to-own or lease-purchase agreements. This financial assistance was awarded according to the terms of individual Annual Contribution Contracts (ACCs) between the government and individual Indian tribes or Tribal Housing Entities. *See* 24 C.F.R. § 1000.10(b) (defining "Annual Contributions Contract"). Each ACC was awarded a certain amount of funding for the Tribal Housing Entity to cover the costs of specific public-housing projects. 42 U.S.C. § 1437c(a)(2) (1996) (explaining the operation of ACCs). That changed.

Congress enacted NAHASDA in an attempt to consolidate low-income housing assistance for Indian tribes and simplify the distribution of funds. NAHASDA terminated the housing assistance programs established under the Housing Act of 1937 and created a new system.[3] This new method of distributing funds sought to "[recognize]

_____

[2] NAHASDA's effective date was October 1, 1997. P.L. 104-330, Tit. I, § 107, 110 Stat. 4030 (1996).

[3] HUD identified programs terminated by NAHASDA in the "Statutory Background" section of its proposed rule. *See* Implementation of the Native American Housing Assistance and Self-Determination Act of 1996, Proposed Rule, 62 Fed. Reg. 35,718, 35,719 (July 2, 1997).

the right of Indian self-determination and tribal self-governance by making such assistance available directly to the Indian tribes or tribally designated entities . . ." 25 U.S.C. § 4101(7). This new system required the distribution of appropriated funds through annual block grants to individual housing entities for the purpose of carrying out affordable housing activities. 25 U.S.C. § 4111.

Congress directed HUD to establish an allocation formula for this new system to reflect the need of the Indian tribes in the distribution of appropriated funds through block grants. 25 U.S.C. § 4152(a).[4] It specifically described the intended structure of the formula:

> The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:
>
> (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
>
> (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.
>
> (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

25 U.S.C. § 4152(b).[5]

---

[4] The full text of the statute is reproduced as Appendix A to this Order and Judgment.

[5] In addition to the factors specified in § 4152(b)(1)-(3), Congress required consideration of two other factors:

> In establishing the formula, the Secretary shall consider --
>
> (1) the relative administrative capacities and other challenges faced by the recipient, including, but not limited to geographic distribution within the Indian area and technical capacity; and

- 4 -

Congress also required the regulations be crafted through a negotiated rulemaking process that involved interested Indian tribes. 25 U.S.C. § 4116. The negotiated rulemaking committee included fifty-eight members. Forty-eight of these members represented "geographically diverse small, medium and large Indian tribes." 62 Fed. Reg. 35,719. This committee was larger "than usually chartered under the Negotiated Rulemaking Act" because of "the diversity of tribal interests, as well as the number and complexity of the issues involved." *Id.* It operated solely by consensus and HUD agreed to use all of the committee consensus decisions, to the extent allowable under the law, as the basis for the proposed rulemaking. *Id.* at 35,719-20. The committee crafted a number of factors for the block grant formula, including the factor at issue in this appeal, which HUD considered when it adopted the final regulations.

The block-grant formula was included in the final regulations and codified at 24 C.F.R. §§ 1000.304–1000.340. It included two separately calculated components: 1) "Formula Current Assisted Housing Stock" units (current units);[6] and 2) "Need."[7] 24

---

(2) the extent to which terminations of assistance under subchapter V of this chapter will affect funding available to State recognized tribes.

25 U.S.C. § 4152(c). Subsection (c)(1) is addressed in the regulations at 24 C.F.R. § 1000.538 which allows HUD to provide technical assistance if the Housing Entity's inability to comply with NAHASDA provisions is not due to willful noncompliance. Subsection (c)(2) references the termination of the housing assistance provided under the Housing Act of 1937 and is addressed at 24 C.F.R. § 1000.312 where HUD includes the 1937 programs in the definition of current units. HUD addressed these factors within its regulations. Neither party raised the section in their briefs, so we do not consider them further.

[6] Formula Current Assisted Stock is defined by regulation to include all dwelling units owned or operated by an entity as of September 30, 1997, and limited other units. 24 C.F.R. § 1000.314. This definition was the starting point in determining current units. Subsequent regulations, including § 1000.318, identified when Formula Current Assisted

C.F.R. § 1000.310. In accordance with the formula, to determine the amount of funding a Tribal Housing Entity would receive in a particular fiscal year, HUD first calculated the number of current units owned or operated by each Tribal Housing Entity and earmarked funds from the total appropriation to fund them.[8] The current need portion for each Tribal Housing Entity was then established by applying preset weighted criteria to the remaining amount of appropriated funds. Because the funds earmarked for the current unit portion of the formula directly reduced the amount of funding available for current need disbursement, the current units component was of primary importance to Tribal Housing Entities. A larger number of current units funded in a particular fiscal year decreased the funds available for the current needs of all Tribal Housing Entities.

The current units calculation for an individual Tribal Housing Entity began with the number of dwelling units owned or operated by that entity at the time of NAHASDA's enactment. *Id.* Over the years, some rent-to-own units became eligible to be transferred from a Tribal Housing Entity's inventory or be otherwise disposed of due to the terms of a contract between the Tribal Housing Entity and the unit's occupant. For

---

Stock became ineligible for purposes of the block grant formula.

[7] The criteria for determining need, each weighted differently, include: (1) American Indian and Alaskan Native (AIAN) households with housing cost burden greater than 50% of "formula area income;" (2) AIAN households that are overcrowded or without kitchen or plumbing; (3) AIAN housing shortage; (4) AIAN households with income less than or equal to 30% of "formula median income;" (5) AIAN households with income between 30% and 50% of "formula median income;" (6) AIAN households with income between 50% and 80% of "formula median income;" and (7) AIAN persons. 24 C.F.R. § 1000.324.

[8] *See* Appendix A to Part 1000 – Indian Housing block grant Formula Mechanics HUD, Nos. 5-6; *see also* 25 U.S.C. § 1000.324.

instance, a lease-to-own agreement between a Tribal Housing Entity and a low-income family may terminate in a given year and title to the residence would be transferred accordingly. Reflecting this reduction, HUD included a downward adjustment in the current units calculation. This adjustment was equal to the number of dwelling units a tribe "no longer has the legal right to own, operate, or maintain . . . whether such right is lost by conveyance, demolition, or otherwise." 24 C.F.R. § 1000.318(a). Units are to be removed from a Tribal Housing Entity's inventory "as soon as practicable after the unit becomes eligible for conveyance." 24 C.F.R. § 1000.318(a)(1). In determining the number of these disqualified units, HUD relied on information provided by the individual Tribal Housing Entities on annual "Formula Response Forms." 24 C.F.R. § 1000.312.

B.      Relevant Factual History

HUD's Inspector General conducted a nation-wide audit in 2002. This included seventeen on-site visits to Tribal Housing Entities across the nation. At five of the Tribal Housing Entities, it evaluated the accuracy of the current units reported on the Formula Response Forms. The audit revealed some Tribal Housing Entities owned or operated fewer dwelling units than they had reported on their Formula Response Forms and were receiving funds for dwelling units they no longer owned or operated. Those findings prompted a nation-wide audit, which showed Fort Peck, and other Housing Entities not relevant to this appeal, had made the same reporting mistake in fiscal years 1997-2003. HUD demanded a refund of these alleged overpayments.

Fort Peck initially refunded a portion of the alleged overpayments but later refused to continue repayment and instead contested the validity of 24 C.F.R. § 1000.318. It

argued NAHASDA's plain language required HUD to continue funding at the 1997 level in the current units portion of the formula. In support of this argument, it stressed Congress's language that the formula "shall be based on . . . [t]he number of low-income housing dwelling units owned or operated at the time," meaning all dwelling units owned or operated in 1997 under 25 U.S.C. § 4181(a). (Appellant's Supp. Appx. at 61.) It asserted HUD's disqualification of units under 24 C.F.R. § 1000.318 violated Congress's expressed intent in § 4152(b)(1). Fort Peck asserted the monies it had refunded to HUD must be returned.

HUD maintained Congress's intent in NAHASDA was to fund all tribal housing projects according to their relative need. It reasoned that a Tribal Housing Entity's need is reduced when dwelling units pass from its control or ownership. *See* 24 C.F.R. § 1000.318 (dwelling units cease to qualify as a current unit when a Tribal Housing Entity "no longer has the legal right to own, operate, or maintain the unit"); *see also* 63 Fed. Reg. 12,334, 12,343 (Mar. 12, 1998).[9] It explained the regulation followed Congress's express direction and intent because the reduction set forth in § 1000.318 was created through a negotiated rulemaking process and was an objectively measurable condition.

After exhausting the agency appeal process, Fort Peck brought suit in federal court challenging HUD's final determination. In relevant part, it claimed: (1) § 1000.318 was contrary to the statutory language in NAHASDA and HUD's conclusions to the contrary

---

[9] One public comment to the proposed rule suggested conveyed units should qualify as current units if the unit is a part of a "five-year Comp Grant plan." HUD rejected this suggestion stating "a conveyed unit, because it has become a private home, does not qualify as [a current unit]." 63 Fed. Reg. at 12,343.

should be overturned; (2) HUD had no authority to seek further refund for overpayment; and (3) the district court should order HUD to return all payments already made.

The district court concluded HUD unlawfully deprived Fort Peck of block-grant funding by improperly removing conveyed properties from the formula. *Fort Peck Housing Auth. v. United States Dept. of Housing & Urban Dev.*, 435 F. Supp. 2d 1125, 1132 (D. Colo. 2006). It determined the plain language of § 4152(b)(1) created a minimum or "floor" of dwelling units to be funded and § 1000.318 violated this requirement. *Id.* In support of this conclusion, the court stressed that 25 U.S.C. § 4181(a) requires any housing formerly funded under the programs established by the 1937 Housing Act "shall, for the following fiscal year and each fiscal year thereafter, be considered a dwelling unit under § 4152(b)." *Id.* at 1133. The district court concluded "[t]he statute leaves no room for the formula to include some, but not all of the number of [1997 units]" because Congress limited agency discretion when it required HUD "shall" use the "definitive" number of 1997 units. *Id.* at 1132.

It further reasoned that even if the statute was ambiguous, deference must be given to Fort Peck's reasonable interpretation of the statute because statutes are to be construed liberally to benefit Indian tribes. *Id.* at 1134. It determined that Fort Peck's interpretation is consistent with NAHASDA's purposes and encouraged the building of new homeownership units which would otherwise not be funded. *Id.* The court considered HUD's regulation to be fundamentally unfair to Housing Entities with large numbers of homeownership units who "suffer decreases in their share of the annual apportionment" as units are conveyed while "tribes with a large percentage of rental units

- 9 -

receive a greater share each year."[10]  *Id.* at 1133.  Finally, the district court concluded Fort Peck's position furthered NAHASDA's goals of self-governance and self-determination by eliminating many bureaucratic burdens and removing HUD's paternalistic oversight of whether units should be conveyed or participants evicted.  *Id.* at 1134-35.

For these reasons the district court invalidated 24 C.F.R. § 1000.318 and ordered HUD "take such administrative action as necessary to implement [its] ruling."  *Id.* at 1136.  In response to a Rule 59(e) motion by Fort Peck[11] requesting return of the partial refund of alleged overpayments, the court refused to order such return because these funds had already been distributed to other Housing Entities, making the issue moot.  *Fort Peck Housing Auth. v. United Stated Dept. of Housing & Urban Dev.*, No. 05-CV-00018, 2006 WL 2192043 at *1 (D. Colo. Aug. 1, 2006).  Instead, it ordered HUD to "take whatever action may be appropriate within its regulatory authority to adjust for its errors in computing [Fort Peck's] entitlement . . . ."  *Id.* at *2.

---

[10] HUD's regulations allowed inclusion of certain dwelling units that Tribal Housing Entities had plans to purchase or construct in 1997 in its initial computation of current units.  The regulations do not allow for inclusion of other units which have been built or purchased by a Tribal Housing Entity since that time.  24 C.F.R. § 1000.312.

[11] Both parties filed motions under Fed. R. Civ. P. 59(e) to alter or amend the original judgment.  HUD requested clarification of the scope of the district court's judgment and requested guidance as to whether administrative actions against other Tribal Housing Entities were included.  The court modified its judgment to limit its holding to administrative action involving Fort Peck.  Neither party appealed from this decision.

## II.

We exercise jurisdiction under the Administrative Procedures Act (APA) and consider whether the HUD's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Our review is *de novo* for agency action under the Administrative Procedure Act. *Defenders of Wildlife v. United States Envtl. Protection Agency*, 415 F.3d 1121, 1126 (10th Cir. 2005). We afford the district court's decision no particular deference. *See Santa Fe Energy Prods. Co. v. McCutcheon*, 90 F.3d 409, 413 (10th Cir. 1996).

"An agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 808 (10th Cir. 1998) (quotation omitted). Statutory interpretation begins with the words Congress has chosen. The inquiry ends if that language is clear. We merely enforce the statute's plain meaning. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). But if an ambiguity confuses the statute's meaning, or irrational results arise from the statute's literal wording, we apply additional interpretive tools to ascertain and give effect to Congress's intent. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 568 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); *Carter v. United States*, 530 U.S. 255, 267 (2000) ("[T]he title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself.") (quotations and alterations omitted). Such tools include consideration of the statute's history and purpose as well as

- 11 -

statutory canons of construction. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

A.      Statutory Interpretation

The parties agree NAHASDA required HUD to create and implement the block-grant formula. They also agree Congress set forth criteria to act as the formula's basis and allowed HUD to identify other criteria. This authorizing language was plain and required the formula be based on factors which reflect "the need of the Indian tribes . . . for assistance for affordable housing activities." 25 U.S.C. § 4152(b). The parties disagree about the amount of discretion Congress gave HUD regarding the formula's creation. The words of Congress are our best guide. Those words explicitly list two factors – the number of 1997 dwelling units and the extent of current need – and a third factor allowing further identification of "[o]ther objectively measurable conditions as the Secretary and the Indian tribes may specify." 25 U.S.C. §§ 4152(b)(1)-(3).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[12] *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666

_____

[12] The importance of context has been aptly illustrated by the Supreme Court, "the scope of what seems a precise technical chess instruction, such as 'you must place the queen next to the king,' varies with context, depending, for example, upon whether the instructor is telling a beginner how to set up the board or telling an advanced player how to checkmate an opponent." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 127 S. Ct. 1534, 1546 (2007).

(2007) (internal citation and quotations omitted).  Here, NAHASDA requires the formula be "based on" three factors.  As used within § 4152(b) where Congress explicitly allowed for further definition of factors by HUD, the phrase "based on" is not synonymous with "equal to."  *See Sierra Club v. EPA*, 356 F.3d 296, 306 (D.C. Cir. 2004) (the term "based on" is ambiguous and does not require the agency's findings rest solely upon a particular model); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) ("based on" may be reasonably interpreted as indicating a "starting point" or "foundation").  Applying the ordinary definition of "based on" means the factors form the basis, beginning, or starting point, of the formula.  *See United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994) ("To 'base upon' means to 'use as a basis for.'" (citing Webster's Third New Int'l Dictionary 180 (1986))).[13]

Congress amended § 4181 of NAHASDA in 2000.  This amendment required "[a]ny housing that is the subject of a contract for tenant-based assistance between the Secretary and an Indian housing authority that is terminated under this section shall, for the following year and each fiscal year thereafter, be considered a dwelling unit under section 4152(b)(1)."  25 U.S.C. § 4181(a).  Fort Peck asserts this amendment supports the district court's conclusion that the downward adjustment in 24 C.F.R. § 1000.318 violated NAHASDA's purpose of requiring the 1997 units act as the basis for the block grant formula.  435 F. Supp. 2d at 1133-34.  This is incorrect.  The amendment did not require the funding of these dwelling units in perpetuity, nor did it require any other

---

[13] Even if Congress's use of the term "based on" creates some ambiguity, the term does not render NAHASDA's purpose or intent ambiguous.

alteration of how HUD had interpreted the statute in its regulatory program. It only required the terminated housing be considered a dwelling unit under § 4152(b)(1) and included as part of the block grant formula's basis -- no more. It did not remove or amend the other two factors of § 4152(b) which also formed the basis for the block grant formula, nor did it limit HUD's discretion to include other objectively measurable conditions in the formula according to § 4152(b)(3). Because HUD included all terminated housing in § 4152(b)(1), it satisfied the requirement of § 4181(a).

HUD incorporated the units required by § 4152(b)(1) when it used all of the 1997 dwelling units as the starting point for the allocation formula. However, this number was but one factor required to meet the statute's overarching mandate that the formula "reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." 25 U.S.C. § 4152(b). HUD's adjustment from the number required by § 4152(b)(1) and § 4181 is of no concern because the adjustment was accomplished through "other objectively measurable conditions" that reflected the need of the Indian tribes in accordance with § 4152(b)(3). Congress's explicit direction allowed for this result. It required the funding be tied to the need of the tribes and granted the negotiated rulemaking committee the authority to craft criteria for inclusion in the formula. HUD determined the funding of units no longer owned or operated by a Tribal Housing Entity decreased the amount of remaining funds available to fund the current need of all tribal programs. Thus, it incorporated a corresponding reduction in the current units portion of the formula funding and effectively increased the amount of funding available for the current need portion of the formula. Interpreting § 4152(b)(1) to prohibit a reduction in

- 14 -

the number of current units corresponding to a measurable reduction in responsibility by the Tribal Housing Entity for those units is inconsistent with the statute's plain language and is contrary to Congress's unambiguous intent that the funding formula relate to the needs of all tribal Housing Entities. *See* 25 U.S.C. § 4152.

While we appreciate the district court's concern with the decreased allocation to entities that chose home-ownership over rental programs, its literal reading of the statutory language conflicts with the plain language of the statute viewed as a whole. The district court was without the benefit of our recent holding in *United Keetoowah Band of Cherokee Indians v. Department of Housing and Urban Development*, 567 F.3d 1235, 1241 (10th Cir. 2009). Therein, we considered whether HUD's regulation imposing a jurisdictional-based factor for funding eligibility was contrary to its authority under the statute. Holding in the affirmative, we stated § 4152(b) "explicitly and unambiguously mandates that the factors in HUD's allocation formula reflect -- in other words, have some connection or nexus with -- the needs of Indian tribes and Indian areas of the tribes. The language does not permit any other reading." *Id.* The same reasoning applies equally here. An interpretation of the formula requirement in NAHASDA that requires a perpetual funding "floor" does not reflect Congress's unambiguous intent that the formula be related to the need of all tribal Housing Entities. Where Congress has expressed its intent, we are bound to give effect to that intent. *Osborne v. Babbitt*, 61 F.3d 810, 812 (10th Cir. 1995).

B.    Agency Rulemaking

Having determined the plain language of the statute did not set a funding floor

- 15 -

based upon the 1997 units, we consider whether the regulation comported with the statutory requirement that the formula relate to the need of the Housing Entities. Congress authorized broad agency authority when it delegated responsibility for creation of the block-grant formula to HUD. 25 U.S.C. § 4152(a). This broad authority, however, was limited by the requirement the formula have a "nexus with" the needs related to assistance for affordable housing activities. *United Keetoowah*, 567 F.3d at 1241; *see also* 25 U.S.C. § 4152(b).

We review agency rulemaking with great deference when a challenged decision involves matters within the agency's area of expertise. *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). Here, the disbursement of funds for low-income housing assistance for Indian tribes was certainly within HUD's expertise: its institutional experiences in implementing the Housing Act of 1937, including the low-income housing programs for Indian tribes which NAHASDA replaced, justify our deference here. Congress not only identified specific factors to serve as the formula's basis but also required cooperation with tribal representatives in finalizing the formula. *See* 25 U.S.C. § 4116. This required participation supplemented HUD's institutional knowledge and expertise.[14]

---

[14] The district court stated this participation of tribal representatives was "of no relevance." *Ft. Peck*, 435 F. Supp. 2d at 1134. It is true a rule developed through negotiated rulemaking shall not be "accorded any greater deference by a court than a rule which is the product of other rulemaking procedures." 5 U.S.C. § 570. However, this does not mean we ignore the forty-eight members of the negotiated rulemaking committee who represented a number of Indian tribes. These representatives had first-hand knowledge of factors helpful in identifying tribal need. We do not grant any greater deference to this regulation because tribal representatives were involved. We do

- 16 -

HUD's regulation complied with the mandate set forth in NAHASDA and clearly included the entire (b)(1) factor as the starting point. *See* 24 C.F.R. §§ 1000.316(a)(1)-(3) (including all of the 1997 units). From this initial number, the formula offset the 1997 units by a definitive number of units as of a definitive date. 24 C.F.R. §§ 1000.316–1000.318. This number reflected the factors explicitly required by §§ 4152(b)(1)-(3). A reduction equal to the number of dwelling units no longer owned or operated by a Tribal Housing Entity recognized the ongoing and evolving needs of Tribal Housing Entities. NAHASDA clearly required interplay between all three factors in the determination of a Tribal Housing Entity's need, including those HUD identified in the rulemaking process. Section 1000.318's downward adjustment was an example of this interplay. It was not arbitrary or capricious.

Finally, Fort Peck asserts even if the regulations are reasonable, we must nonetheless reject them and defer to its interpretation of NAHASDA because "statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). Because NAHASDA was unambiguous and the final regulations were properly promulgated within NAHASDA's mandate, we need not address this issue except to note the canon cited does not allow a court to rob Peter to pay Paul no matter how well intentioned Paul may be. The statute was not ambiguous and HUD's regulation dispersed block-grant funding in such a way as to meet the current needs of all tribes.

recognize the import of their participation and insight just as we recognize the value of public comments when we consider traditional rulemaking procedures.

We **DENY** the motion for leave to file a brief as amicus curiae submitted by other Housing Entities as untimely, **REVERSE** the district court's invalidation of 24 C.F.R. § 1000.318, **REMAND** for action consistent with this Order and Judgment, and **DISMISS** Fort Peck's cross-appeal.[15]

**Entered by the Court:**


**Terrence L. O'Brien**
United States Circuit Judge

---

[15] Because HUD's actions did not violate Congress's mandate, the issues raised in Fort Peck's cross-appeal are moot.

▷
**Effective: December 27, 2000**

United States Code Annotated Currentness
Title 25. Indians
▤   Chapter 43. Native American Housing Assistance and Self-Determination (Refs & Annos)
▤   Subchapter III. Compliance, Audits, and, Report
➡ **§ 4152. Allocation formula**

(a) Establishment

The Secretary shall, by regulations issued not later than the expiration of the 12-month period beginning on October 26, 1996, in the manner provided under section 4116 of this title, establish a formula to provide for allocating amounts available for a fiscal year for block grants under this chapter among Indian tribes in accordance with the requirements of this section.

(b) Factors for determination of need

The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:

**(1)** The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.

**(2)** The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.

**(3)** Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

(c) Other factors for consideration

In establishing the formula, the Secretary shall consider--

**(1)** the relative administrative capacities and other challenges faced by the recipient, including, but not limited to geographic distribution within the Indian area and technical capacity; and

**(2)** the extent to which terminations of assistance under subchapter V of this chapter will affect funding available to State recognized tribes.

(d) Funding for public housing operation and modernization

(1) Full funding

(A) In general

Except with respect to an Indian tribe described in subparagraph (B), the formula shall provide that, if, in any fiscal year, the total amount made available for assistance under this chapter is equal to or greater than the total amount made available for fiscal year 1996 for assistance for the operation and modernization of public housing developed or operated pursuant to a contract between the Secretary and an Indian housing authority pursuant to the United States Housing Act of 1937 [42 U.S.C.A. § 1437 et seq.], the amount provided for such fiscal year for each Indian tribe for which such operating or modernization assistance was provided for fiscal year 1996 shall not be less than the total amount of such operating and modernization assistance provided for fiscal year 1996 for such tribe.

(B) Certain Indian tribes

With respect to fiscal year 2001 and each fiscal year thereafter, for any Indian tribe with an Indian housing authority that owns or operates fewer than 250 public housing units, the formula shall provide that if the amount provided for a fiscal year in which the total amount made available for assistance under this chapter is equal to or greater than the amount made available for fiscal year 1996 for assistance for the operation and modernization of the public housing referred to in subparagraph (A), then the amount provided to that Indian tribe as modernization assistance shall be equal to the average annual amount of funds provided to the Indian tribe (other than funds provided as emergency assistance) under the assistance program under section 14 of the United States Housing Act of 1937 (42 U.S.C. 1437*l*) for the period beginning with fiscal year 1992 and ending with fiscal year 1997.

(2) Partial funding

The formula shall provide that, if, in any fiscal year, the total amount made available for assistance under this chapter is less than the total amount made available for fiscal year 1996 for assistance for the operation and modernization of public housing developed or

operated pursuant to a contract between the Secretary and an Indian housing authority pursuant to the United States Housing Act of 1937 [42 U.S.C.A. § 1437 et seq.], the amount provided for such fiscal year for each Indian tribe for which such operating or modernization assistance was provided for fiscal year 1996 shall not be less than the amount that bears the same ratio to the total amount available for assistance under this chapter for such fiscal year that the amount of operating and modernization assistance provided for the tribe for fiscal year 1996 bears to the total amount made available for fiscal year 1996 for assistance for the operation and modernization of such public housing.

(e) Effective date

This section shall take effect on October 26, 1996.

CREDIT(S)

(Pub.L. 104-330, Title III, § 302, Oct. 26, 1996, 110 Stat. 4036; Pub.L. 106-568, Title X, § 1003(g), Dec. 27, 2000, 114 Stat. 2928; Pub.L. 106-569, Title V, § 503(f), Dec. 27, 2000, 114 Stat. 2964.)

HISTORICAL AND STATUTORY NOTES

References in Text

This chapter, referred to in subsecs. (a) and (d), was in the original "this Act", meaning the Native American Housing Assistance and Self-Determination Act of 1996, Pub.L. 104-330, Oct. 26, 1996, 110 Stat. 4016, as amended, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4101 of this title and Tables.

Subchapter V of this chapter, referred to in subsec. (c)(2), was in the original "title V", meaning Title V of Pub.L. 104-330, Oct. 26, 1996, 110 Stat. 4041, as amended, which is classified principally to subchapter V of this chapter; see Tables for complete classification.

The United States Housing Act of 1937, referred to in subsec. (d)(1)(A), is Act Sept. 1, 1937, c. 896, as revised generally by Pub.L. 93-383, Title II, § 201(a), Aug. 22, 1974, 88 Stat. 653, which is classified principally to chapter 8 (section 1437 et seq.) of Title 42. For complete classification of this Act to the Code, see Short Title note set out under section 1437 of Title 42 and Tables.

"Section 14 of the United States Housing Act of 1937 (42 U.S.C. 1437*l*)", referred to in subsec. (d)(1)(B), was repealed by Pub.L. 105-276, Title V, § 522(a), Oct. 21, 1998, 112 Stat. 2564.

Codifications

Pub.L. 106-569 amended this section without any reference to prior identical amendment by Pub.L. 106-568. See 2000 Amendments notes under this section.

Amendments

2000 Amendments. Subsec. (d)(1)(A). Pub.L. 106-569, § 503(f)(1), designated existing provisions as subpar. (A), added a heading thereto, and as so designated, substituted "Except with respect to an Indian tribe described in subparagraph (B), the formula" for "The formula".

Pub.L. 106-568, § 1003(g)(1), designated existing provisions as subpar. (A), added a heading thereto, and as so designated, substituted "Except with respect to an Indian tribe described in subparagraph (B), the formula" for "The formula". See Codifications note set out under this section.

Subsec. (d)(1)(B). Pub.L. 106-569, § 503(f)(2), added subpar. (B).

Pub.L. 106-569, § 1003(g)(2), added subpar. (B). See Codifications note set out under this section.

LIBRARY REFERENCES

American Digest System

Indians ⚷9.
Key Number System Topic No.209.

25 U.S.C.A. § 4152, 25 USCA § 4152

Current through P.L. 110-316 (excluding P.L. 110-234, 110-246, 110-289, 110-314, and 110-315) approved 8-14-08

Copr. (C) 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works