GAJARSA, Circuit Judge,
concurring-in-part and dissenting-in-part.
I join Part I of the majority opinion with the understanding that Original CAS 413.50 is applied pursuant to a stipulation by the parties. Unfortunately, the majority fails to apply the appropriate textual interpretation of the statute and regulations at issue in Part II. The majority thereby obtains an outcome-driven result that is contrary to the CASB authorizing legislation and the FAR, is contrary to Supreme Court precedent regarding the interpretation of statutory and regulatory texts, and is not supported by the factual record. The majority is complicating the legal analysis. The issue is rather straightforward. Namely, when the United States has contributed to a surplus of a defined benefit plan, does it have a right and discretion to determine how it can claim the overpayment? From this latest installment of the misnamed “national policy of fairness to contractors,” England v. Contel Adv. Sys., Inc., 384 F.3d 1372, 1383 (Fed.Cir.2004) (Newman, J., dissenting), I respectfully dissent.
In my judgment, the majority makes three fundamental errors in Part II of its opinion. First, the majority fails to interpret the regulations at issue in light of the CASB authorizing legislation, 41 U.S.C. § 422, which requires that contract price adjustments “be made, where applicable, on relevant contracts between the United *1380 States and the contractor.” (emphasis added). The simple and straight-forward import of that language is that cost adjustments must be made on contracts between the Government and the contractor who overcharged the Government, i.e. DIRECTV. Moreover, the requirement that the adjustment be made on “relevant contracts” raises a factual question that cannot be resolved on the record before us and, therefore, remand is appropriate. Second, to the degree that Section 422(h) is ambiguous, the majority selectively misreads interpretive regulations that give discretion in the manner of recognizing cost impacts but that explicitly require the Government and the contractor to agree on the manner selected. See 48 C.F.R. § 9903.306. Instead of forcing the Government to accept a cost reduction from third parties, it should be given the opportunity-to determine whether it should obtain a refund from the contractors. Although the Government admits that it will benefit from lower pension payments in the future under the majority’s holding, it should be the Government’s determination what compensation it receives when a segment is closed. Finally, the majority ignores changes to the Credits provision, 48 C.F.R. § 31.201-5, as well as the plain text of 48 C.F.R. § 31.205 — 6(j)(4), both of which shed important light on who may provide the cost reductions at issue. I treat each of these errors in turn.
I.
This case implicates two provisions of the CASB authorizing legislation. Section 422(h)(1) requires that contractors agree to a “contract price adjustment” when, as is the case here, they change their cost accounting practices or fail to comply with the standards promulgated by the Board:
The Board shall promulgate rules and regulations for the implementation of cost accounting standards promulgated or interpreted under subsection (f) of this section. Such regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the United States to ... (B) agree to a contract 'price adjustment, with interest, for any increased costs paid to such contractor or subcontractor by the United States by reason of a change in the contractor’s or subcontractor’s cost accounting practices or by reason of a failure by the contractor or subcontractor to comply with applicable cost accounting standards.
41 U.S.C. § 422(h)(1) (emphasis added).[1] The contract price adjustment is limited, however, by Section 422(h)(3), which states:
Any contract price adjustment undertaken pursuant to paragraph (1)(B) shall be made, where applicable, on relevant contracts between the United States and the contractor that are subject to the cost accounting standards so as to protect the United States from payment, in the aggregate, of increased costs (as defined by the Board). In no case shall the Government recover costs greater than the increased cost (as defined by the Board) to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the contractor made a change in *1381 its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.
Id. § 422(h)(3) (emphases added).[2]
In interpreting these provisions, we must begin with the plain language of the statute. “If the intent of Congress is clear, that is the end of the matter; for the court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress.” Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43,104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But it is well established that “[i]f ... Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... ” Id. at 843, 104 S.Ct. 2778. “Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the [answer of the agency charged with implementing the statute] is based on a permissible construction of the statute.” Id. Moreover, “[i]f the agency interpretation is not in conflict with the plain language of the statute, deference is due [to that interpretation].” Nat’l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992).
A.
Section 422 is unambiguous with regard to the party responsible for making the required contract price adjustment. Section 422(h)(1), which creates the obligation for a contract price adjustment, requires that a contractor “agree to a contract price adjustment ... for any increased costs paid to such contractor or subcontractor by the United States.” As a matter of elementary grammar, the statute’s use of “such” is a demonstrative adjective, and it must refer to a clear antecedent. See Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 94, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007) (explaining that use of “such” indicates a specific antecedent); Gates & Fox Co. v. OSHRC, 790 F.2d 154, 156 (D.C.Cir.1986) (Scalia, J.) (same). Applied here, the reference to “such contractor” must be read to link the party responsible for the contract price adjustment to the specific contractor to whom the Government paid increased costs.
The numerous references to “the contractor” in the statute are similarly unambiguous. Section 422(h)(1) requires a contract price adjustment in response to “a change in the contractor’s or subcontractor’s cost accounting practices” or if “the contractor or subcontractor [fails] to comply with applicable cost accounting standards.” Likewise, the provision limiting' that cost adjustment, Section 422(h)(3), requires that the contract price adjustment be made on “relevant contracts between the United States and the contractor.” Indeed, each use of the word “contractor” in Section 422(h)(3) is prefaced by the definite article “the.” This use of a definite article raises an extraordinarily strong inference that a specific contractor is referenced. See, e.g., Work v. McAlester-Edwards Coal Co., 262 U.S. 200, 208, 43 S.Ct. 580, 67 L.Ed. 949 (1923). As the United States Court of Appeals for the District of Columbia Circuit explained: *1382 Am. Bus Ass’n v. Slater, 231 F.3d 1, 4-5 (D.C.Cir.2000) (quotation marks omitted). We have cited that rule to hold that the phrase “the use” in 35 U.S.C. § 271(e)(2)(A) must be interpreted to mean a specific use, i.e., “the use for which the FDA has granted an NDA.” Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1356 (Fed.Cir.2003). And I would apply the rule here: the statutory references to “the contractor” must be read to burden the specific contractor that overcharged the Government, namely DIRECTV, with the obligation to make the contract price adjustment. Not only is the majority’s contrary conclusion inconsistent ■with basic grammatical and interpretive rules, it is inconsistent with their reliance on those rules in Part I to interpret references to “the segment.”
*1381 It is a rule of law well established that the definite article “the” particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of “a” or “an.”
*1382 My conclusion is further confirmed by the statute’s requirement that the contract price adjustment be made on “relevant contracts between the contractor and the United States.” 41 U.S.C. § 422(h)(3). Congress did not authorize adjustments by any contractor or on any contract; the adjustments must be on a specific subset of contracts — “relevant contracts” — between the contractor and the United States. That requirement raises additional hurdles to recovering the adjustment on contracts between Raytheon or Boeing, on the one hand, and the United States, on the other.
For example, the Government’s consent was presumably necessary in order for DIRECTV to transfer open contracts to Boeing and Raytheon. See 41 U.S.C. § 15;[3] cf. ITT Gilfillan, Inc. v. United States, 471 F.2d 1382, 1384 (Ct.Cl.1973) (describing a transfer via novation between the United States and a successor contractor); Gen. Elec. Co. v. United States, 84 Fed.Cl. 129, 134-36 (2008) (describing an “Advance Agreement” between the United States and a successor contractor). But if that consent established a novation, the resulting contracts do not have “the contractor” who overcharged the Government as a party. Indeed, such contracts would be entirely new and distinct from those between DIRECTV and the United States. See, e.g., Restatement (Second) of Contracts § 280.
The requirement that price adjustments be made on “relevant contracts” also raises issues far more significant than the formalistic effect of a novation. The contracts on which Raytheon and Boeing provided price adjustments are not in the record, and the trial court made no findings as to the nature of those contracts. The majority thus has no basis for concluding that the claimed reductions were provided on “relevant contracts” as the statute requires. Were the reductions provided on novated contracts, which are at least arguably “relevant”? Were they provided on different contracts with the same federal agency? Or did Boeing and Raytheon provide price reductions on contracts involving entirely different agencies? One would be hard-pressed to argue that contracts involving different projects or different agencies satisfy the statutory requirement that price adjustments be made on “relevant contracts.” Thus, remand is necessary to complete the factual record. Beyond the majority’s misreading of who is responsible for any price adjustment, the majority conveniently ignores the “relevant contracts” requirement and its attendant factual inquiry, and focuses on the Government’s concession, ex poste, *1383 that it received more savings from the successor contracts than DIRECTV would owe the Government absent such a transfer. Majority Op. at 1378.
The majority identifies no limit to its logic. It becomes a continuous vortex where the Government can be forced to recover its increased costs from any person, on any contract, and in any form— regardless of the terms of the original contract — so long as the Government’s recovery is “caused by” the original contractor and a contrary finding would result in what the majority deems a “windfall.”[4] In my judgment, 41 U.S.C. § 422(h)(3) cannot be read to create such a fait accompli defense when a contractor acts without the Government’s agreement. That is particularly true where, as here, the Government argues that it had little or no contemporaneous knowledge of the claimed cost reductions and there is no record evidence to the contrary.
On appeal, the Government specifically argued that it did not agree to recover its excess costs through cost reductions provided by Boeing and Raytheon. Gov’t Br. 32-34, 47-49. Indeed, the Government states that “there is no evidence in the record that [Boeing and Raytheon] ever sent an invoice or told the Government at any time how much pension costs [the Government] was allegedly saving,” Reply Br. 14, and that the cost reductions at issue were provided “officiously,” Gov’t Br. 42 n. 6. Moreover, the trial court specifically found that DIRECTV “did not present any evidence regarding the role the [Government played in either reviewing or approving the subject sales from DIRECTV to Raytheon or Boeing.” DIRECTV Grp., Inc. v. United States, 89 Fed.Cl. 302, 307 (2009). Given that the record contains no evidence regarding the Government’s agreement vel non, I would vacate the grant of summary judgment and remand for trial on that issue.
B.
In support of its position, the majority cites — partially and selectively — 48 C.F.R. § 9903.306(f). Majority Op. at 1383. That provision states, in full:
Whether cost impact is recognized by modifying a single contract, several but not all contracts, or all contracts, or any other suitable technique, is a contract administration matter. The Cost Accounting Standards rules do not in any way restrict the capacity of the pariies to select the method by which the cost impact attributable to a change in cost accounting practice is recognized.
48 C.F.R. § 9903.306(f) (2010) (emphases added). Notably absent from the majority’s opinion is Paragraph (e) of the same section:
An adjustment to the contract price or of cost allowances pursuant to the Cost Accounting Standards clause at 9903.20141(a) may not be required when a change in cost accounting practices or a failure to follow Standards or cost accounting practices is estimated to result in increased costs being paid under a particular contract by the United States. This circumstance may arise when a contractor is performing two or more covered contracts, and the change or failure affects all such contracts. The change or failure may increase the cost paid under one or more of the contracts, while decreasing the cost paid under one or more of the contracts. In such case, the Government will not require price adjustment for any increased costs paid by the United States, so long as the cost decreases under one or more contracts *1384 are at least equal to the increased cost under the other affected contracts, provided that the contractor and the affected contracting officers agree on the method by which the price adjustments are to be made for all affected contracts. In this situation, the contracting agencies would, of course, require an adjustment of the contract price or cost allowances, as appropriate, to the extent that the increases under certain contracts were not offset by the decreases under the remaining contracts.
Id. § 9903.306(e) (emphasis added). Paragraph (a)(4)(h) of the cross-referenced Cost Accounting Standards Clause, 48 C.F.R. § 9903.201-4(a) similarly requires a contractor to “[njegotiate with the Contracting Officer to determine the terms and conditions under which a change may be made to a cost accounting practice.... ” While I agree that these regulations shed light on the matter at issue, they do not support the majority’s position. I also agree that these regulatory provisions provide contracting officers with broad discretion to agree to alternative methods of recouping overcharges.[5] But the references to “contract administration matter” and “the capacity of the parties to select” in Paragraph (f) indicate that the Government must actually agree to the method selected, and Paragraph (e) states so explicitly.
Section 422(h) is silent on the manner in which the contractor can agree to a price adjustment and the manner in which the Government can recover increased costs from contractors. I believe 48 C.F.R. § 9903.306 is entitled to Chevron deference because it fills a legislative gap on those issues, is reasonable, and — properly interpreted — requires that the Government agree to the specific method of recovering overcharges by the contractor. However, summary judgment is inappropriate in this case because there is no evidence that the Government agreed to the cost reductions instead of a refund.
II.
In support of its holding, the majority focuses its analysis on two FAR provisions: the Allowable Cost and Payment Clause and the Credits Clause. Doing so is misleading. Even if the FAR were to support the majority’s holding, that support must yield vis-a-vis the CAS, at least on the question as to which contracts a particular cost is assigned. See Kearfott Guidance & Navigation Corp. v. Rumsfeld, 320 F.3d 1369, 1375 (Fed.Cir.2003) (“When there is a conflict between FAR and CAS over allocability, the CAS regulation governs.”). However, the FAR also does not support the majority’s result.
I agree that, as with the CAS authorizing legislation, the Credits Clause has consistently burdened “the Contractor,” in this case DIRECTV, with the obligation of paying the Government any amount owed. *1385 Majority Op. at 1376-77. But the majority then finds that the Credit Clause’s authorization for payment via a “cost reduction” permits DIRECTV to force the Government to accept a cost reduction provided by a third party, i.e. Boeing and Raytheon. Id. at 1377-78. Not only is that result an erroneous reading of the Credits provision and contrary to the CAS authorizing statute, it requires the majority to ignore the plain language of 48 C.F.R. § 31.205-6(j)(4).
The Credits provision does not directly specify who must provide a cost reduction or cash refund. It does, however, provide guidance. The reference in the Credits provision to a “refund” necessarily implicates the recipient of the funds, i.e., the contractor, and the reference to a “cost reduction” as an alternative to a “refund” implies that both should originate from the same source. See United States v. Stevens, -U.S.-, 130 S.Ct. 1577, 1588, 176 L.Ed.2d 435 (2010) (applying the doctrine of noscitur a sociis). Whatever ambiguity remains is resolved by Section 31.205 — 6(j)(4). The version of that provision in effect from September 20, 1989, through December 28, 1998, states that whenever “[pension] assets are constructively received by it for any reason, the contractor shall make a refund or give a credit to the Government for its equitable share.” 48 C.F.R. § 31.205-6(j)(4) (1990) (emphasis added). In this case, DIRECTV received assets from the pension funds in question, and Section 31.205-6(j)(4) mandates that “the contractor,” i.e., DIRECTV, “make a refund or give a credit to the Government for its equitable share.”
The majority’s blasé indifference to the plain language of § 31.205 — 6(j)(4), which applies whenever “[pension plan] assets are constructively received by [a contractor] for any reason,” is apparently attributable to that provision appearing under the heading “Termination of defined benefit pension plans.” See Majority Op. at 1378-79. The majority plainly errs to the degree it impermissibly ignores the text of § 31.205-6(j)(4) based on the provision’s heading. See, e.g., Intel Corp. v. Advanced Micro Devices, 542 U.S. 241, 256, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004) (stating that the caption cannot undo or limit the plain text of a statute). And the regulatory history of that provision makes clear that its coverage extends beyond pension plan terminations; indeed, the originally proposed language was specifically broadened so as to bring “any reversions to contractors of pension fund assets” within its scope. 54 Fed.Reg. at 34751 (emphasis added). Because DIRECTV retained pension surplus in this case, it has constructively received surplus assets and section 31.205 — 6(j)(4) requires DIRECTV to give a cost reduction or refund to the Government.
The result is no different if the majority instead relies on the Credit Clause’s cross-reference to Section 31.205 — 6(j)(4) “for rules related to refund or credit to the Government upon termination of an over-funded defined benefit pension plan” because “the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citation omitted). The same rule applies to the construction of regulations. Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1577 (Fed.Cir.1995) (en banc). Consistent with that rule, an imprecise cross-reference in the Credits provision cannot be read to negate the applicability of Section 31.205 — 6(j)(4) in situations plainly covered by its text. Indeed, post-1998 versions of the Credits provision remedy the imprecision, and cross-reference Section 31.205 — 6(j)(4) “for *1386 rules governing refund or credit to the Government associated, with pension adjustments and asset reversions.” 68 Fed. Reg. at 58597 (emphasis added).
Thus, neither the CAS nor the FAR allow DIRECTV to escape its obligation to pay. Of course, the Government was free to agree to a different arrangement, but that is not what the majority holds. It forces the Government to take what the contractor gives it.
III.
In condoning DIRECTV’s fait accompli defense, the majority entirely neglects that contracts are at issue. The Government contracted for specific goods and services from a specific party, in exchange for payment of costs according to a specified formula. The contracts, along with the FAR and the CAS provisions incorporated therein, specified how cost adjustments should be made and from whom those adjustments could be recovered. The majority claims I argue for an “absurd result”. See Majority Op. at 1379. However, there is nothing absurd about holding a party to a contract and requiring them to pay when the contract says they must. DIRECTV sold a segment that included an overfunded pension fund. The sale price most certainly was increased to reflect the excess funds contained in the pension, most of which are available to the purchaser in the event the fund is terminated in the future. Thus, DIRECTV received more for the sale of the segment than it would have had the pension not been overfunded. A portion of that increased sale price is owed to the Government. The fact that Boeing and Raytheon will supposedly charge the Government less in the future is irrelevant to the fact that DIRECTV has avoided its obligations under the contract to the potential detriment of the taxpayers.
This court has long recognized that “[t]he need for mutual fair dealing is no less required in contracts to which the [GJovernment is a party, than in any other commercial arrangement.” Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed.Cir.1988) (Newman, J.). Over and above the plain text of the statute and regulations at issue, as well as the maxim that “[m]en must turn square corners when they deal with the Government,” Rock Island v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920) (Holmes, J.), fundamental fairness dictates that the Government should not be forced to accept price adjustments on contracts except those for which it bargained.
CONCLUSION
Despite the myriad of interpretive rules available for guidance, see Karl Llewellyn, Remarks on the Theory of Appellate Decision, 3 Vand. L.Rev. 395, 401-06 (1950), the thrusts and parries of the classic canons — not to mention the rules of English grammar — proved inadequate to reach the result sought by the majority. Because the majority fails to apply these rules, I respectfully dissent.

. While this appeal was pending, 41 U.S.C. § 422 was repealed and recodified. See Act of Jan. 4, 2011, Pub.L. No. 111-350, § 3, 124 Stat. 3677, 3695-700. 41 U.S.C. § 422(h)(1) was recodified with minor changes in phraseology at 41 U.S.C. § 1502(f)(2). The changes were not intended to substantively alter the original statute. Id. §§ 2, 6; see also H.R.Rep. No. 111-42, at 3 ("This bill is intended to restate existing law without substantive change.”).

. 41 U.S.C. § 422(h)(3) was recodified at 41 U.S.C. § 1503(b).

. § 15 was recodified at the same time as § 422 at 41 U.S.C. § 6305. Pub.L. No. 111-350, § 3.

. Notably, the term ''windfall” appears nowhere in the statute or the CAS.

. Independent of the discretion recognized in 48 C.F.R. § 9903.306, we have long-recognized that — absent a clear statutory or regulatory limit to their authority — contracting officers have broad discretion in the administration of contracts under their supervision. PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed.Cir.2010); LDG Timber Enters., Inc. v. Glickman, 114 F.3d 1140, 1143 (Fed.Cir.1997) (distinguishing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Included in that discretion is the authority to waive provisions meant to protect the Government. D & H Distrib. Co. v. United States, 102 F.3d 542, 546 (Fed.Cir.1996). Thus, even in the absence of regulations affirmatively granting discretion, I would recognize the power of contracting officers to waive the "relevant contracts” requirement. The Government argues that no such waiver was provided; that argument raises a question of fact that would preclude summary judgment.